RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0186p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

                          *Plaintiff-Appellee,*

    *v.*

KWAME M. KILPATRICK (13-2500); BOBBY W. FERGUSON (14-1120),

                          *Defendants-Appellants.*

Nos. 13-2500;14-1120

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:10-cr-20403—Nancy G. Edmunds, District Judge.

Argued: January 13, 2015

Decided and Filed: August 14, 2015

Before: SILER, GRIFFIN, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Harold Gurewitz, GUREWITZ & RABEN, PLC, Detroit, Michigan, for Appellant in 13-2500. Susan W. Van Dusen, Coral Gables, Florida, for Appellant in 14-1120. Andrew Goetz, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Harold Gurewitz, GUREWITZ & RABEN, PLC, Detroit, Michigan, for Appellant in 13-2500. Susan W. Van Dusen, Coral Gables, Florida, Gerald K. Evelyn, Detroit, Michigan, for Appellant in 14-1120. Andrew Goetz, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

---

**OPINION**

---

SILER, Circuit Judge.   Codefendants Kwame Kilpatrick, former mayor of Detroit, and Bobby Ferguson, a Detroit contractor, challenge their jury convictions for bribery, extortion, mail and wire fraud, RICO conspiracy, and tax evasion.  The issues are whether: (1) Kilpatrick was denied his constitutional right to conflict-free counsel because his two lead attorneys had recently become "of counsel" to a firm that was suing Kilpatrick for alleged conduct related to his criminal charges; (2) the extensive testimony by two case agents violated the Rules of Evidence; (3) the district court erred when it allowed witnesses to report what other people had told them about Kilpatrick and Ferguson as evidence that the witnesses feared the defendants; and (4) the district court erred by ordering Kilpatrick to pay restitution to the Detroit Water & Sewerage Department and to the IRS.  For the reasons that follow, we **AFFIRM** the convictions, but **VACATE** and **REMAND** the restitution order.

## I.  INTRODUCTION

The trial of Kilpatrick, Ferguson, and Bernard Kilpatrick (Kilpatrick's father, who is not a party in this appeal) transpired from September 2012 to March 2013.   The six-month proceeding included almost 100 government witnesses and over 700 exhibits, and encompassed 10,000 pages of transcripts.  The jury found Kilpatrick guilty of 24 of the 30 counts against him. These include one count of RICO conspiracy, 18 U.S.C. § 1962(d); four counts of extortion, 18 U.S.C. § 1951; one count of attempted extortion, 18 U.S.C. § 1951; one count of bribery, 18 U.S.C. § 666(a); eleven counts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343; five counts of subscribing a false tax return, 26 U.S.C. § 7206(a); and one count of income tax evasion, 26 U.S.C. § 7201.  The jury found Ferguson guilty of nine out of eleven counts:  one count of RICO conspiracy, 18 U.S.C. § 1962(d); six counts of extortion, 18 U.S.C. § 1951; one count of attempted extortion, 18 U.S.C. § 1951; and one count of bribery, 18 U.S.C. § 666(a).

Kilpatrick and Ferguson then moved for a new trial.  Among their grounds for relief were the first three arguments they now make to this court.  The district court denied the motion.

The issues in this appeal do not require a detailed explanation of the charges and the evidence. Suffice it to say that the government's main theory was that Kilpatrick and Ferguson conspired to extort money from other Detroit-area contractors by pressuring them to include Ferguson's companies in their city contracts—even when Ferguson's companies were not the most qualified candidates and even when Ferguson's companies did no work.

## II. KILPATRICK'S ATTORNEYS

We turn first to Kilpatrick's claim that he was denied his constitutional right to conflict-free counsel. This claim concerns Kilpatrick's lead trial attorneys, James Thomas and Michael Naughton. Kilpatrick initially hired Thomas in 2008 to represent him in other matters. After Kilpatrick was indicted in this case, the district court—upon Kilpatrick's request—appointed Thomas and Naughton to serve as his counsel under the Criminal Justice Act.

## A. FACTS

From 2005 to 2010, the year of Kilpatrick's indictment, Thomas represented Gaspar Fiore. Fiore eventually became a victim-witness in the government's investigation of Kilpatrick and Ferguson.

In July 2011, the Macomb Interceptor Drain Drainage District filed a civil complaint against Kilpatrick as lead defendant in a case involving the Macomb Drain project—one of the city sewer department projects that was an issue in the criminal case. The plaintiff's counsel in that lawsuit was the firm of O'Reilly Rancilio P.C. ("the O'Reilly Firm"). Although Kilpatrick did not retain Thomas and Naughton to represent him in the civil case, Thomas and Naughton filed Kilpatrick's answer to prevent default. In April 2012, Thomas and Naughton became "of counsel" attorneys with the O'Reilly Firm. Accordingly, they obtained an order from the court in the civil suit allowing them to withdraw from representing Kilpatrick. Naughton certified that he served Kilpatrick with a copy of the order and indicated Kilpatrick acknowledged receipt of the order. In August 2012, shortly before the criminal trial, Kilpatrick told the district court that he wanted Thomas to withdraw on account of Thomas's previous representation of Fiore and a breakdown in the attorney-client relationship.

The court asked for briefing on all possible conflicts and held a hearing on August 14, 2012 (an earlier conflict hearing on August 7 did not concern the O'Reilly Firm issue). Thomas told the court he could not ethically cross-examine his former client Fiore. He also explained that he and Naughton maintained a separate office from the O'Reilly Firm, had separate electronic filings systems, and had no financial ties to the Macomb Drain litigation.

To alleviate the apparent conflict, the government agreed to withdraw the charges that concerned Fiore. Additionally, the court appointed a separate attorney to cross-examine the witnesses related to the Macomb Drain project.[1] In light of these safeguards and the uncontested evidence that Thomas and Naughton had separate offices and separate physical and electronic filing systems from the O'Reilly Firm and no financial relationship to the Macomb Drain litigation, the district court declined to disqualify Kilpatrick's attorneys.

The district court also considered Kilpatrick's claim that he had lost trust in his attorneys and could no longer work with them. The court denied Kilpatrick's motion to replace his attorneys, finding that it was merely a tactic to delay the trial. Kilpatrick does not appeal this aspect of the decision.

The criminal trial began on September 6, 2012. On October 31, 2012, the court in the civil case dismissed all claims against Kilpatrick. On February 11, 2013, the day closing arguments began in the criminal trial, the court in the civil case denied the plaintiff's motion for reconsideration.

On appeal, Kilpatrick points out that the civil suit incorporated allegations from Kilpatrick's indictment, and that the civil plaintiff attempted to amend its complaint during the criminal trial, drawing on evidence that was being developed during that trial. Thomas and Naughton, Kilpatrick explains, "were defending Kilpatrick in the criminal case on the very same alleged acts of corruption that the firm to which they were of counsel sought to establish in a parallel civil suit."

---

[1]That attorney was Harold Gurewitz, who represents Kilpatrick in this appeal.

## B.  ANALYSIS

Kilpatrick contends that (1) Thomas and Naughton had an actual conflict of interest due to the O'Reilly Firm's simultaneous representation of the plaintiff in the civil suit, which he argues deprived him of the effective assistance of counsel; and (2) the district court failed to thoroughly investigate and resolve the attorneys' conflicts.

Whether counsel rendered ineffective assistance is a mixed question of law and fact that we review de novo.  *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004).  We review the district court's underlying factual findings for clear error.  *Id.*

The Sixth Amendment's right to counsel includes a "correlative right to representation that is free from conflicts of interest."  *Wood v. Georgia*, 450 U.S. 261, 271 (1981).  For most ineffective-assistance-of-counsel claims, the defendant must prove both (1) deficient performance and (2) prejudice to warrant reversal of a conviction.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  But conflict-of-interest claims warrant a modified *Strickland* analysis. *Moore v. Mitchell*, 708 F.3d 760, 777 (6th Cir.), *cert. denied sub nom. Moore v. Robinson*, 134 S. Ct. 693 (2013).  When assessing alleged conflicts of interest, courts presume prejudice exists if the defendant demonstrates that counsel "actively represented conflicting interests" and that this "actual conflict of interest adversely affected" the lawyer's performance.  *Burger v. Kemp*, 483 U.S. 776, 783 (1987) (quoting *Strickland*, 466 U.S. at 692).

To prove actual conflict, a defendant must "point to specific instances in the record" and "make a factual showing of inconsistent interests."  *Thomas v. Foltz*, 818 F.2d 476, 481 (6th Cir. 1987) (quoting *United States v. Mers*, 701 F.2d 1321, 1328 (11th Cir. 1983)).  The defendant must show that the lawyer "made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." *McFarland*, 356 F.3d at 705 (quoting *Thomas*, 818 F.2d at 481).  However, the more reasonable the lawyer's choice, the less likely it was the result of actual conflict.  *Id*. at 706.

Kilpatrick's ineffective-assistance claim fails for two independent reasons:  Kilpatrick cannot show that (1) his attorneys actively represented conflicting interests or (2) an actual conflict adversely affected their performance.  First, to establish the actual conflict, Kilpatrick

cites the Michigan Rules of Professional Conduct and a State Bar of Michigan Opinion. Together, the sources prohibit a lawyer (and through imputed disqualification, the firm with which the lawyer is associated, including through an of-counsel relationship) from representing a client if the representation is "directly adverse" to another client. Mich. R. Prof'l Conduct 1.7(a), 1.10(a); Mich. Bar Op. No. RI-102 (Oct. 1, 1991). He argues that, based on Michigan's professional ethics rules, Thomas's and Naughton's of-counsel affiliation with the O'Reilly Firm created an actual conflict. Kilpatrick's argument, standing alone, fails because all it suggests is a "per se" conflict, not an "actual" conflict. *Moore*, 708 F.3d at 777.

The constitutional question we must answer is not whether Kilpatrick's attorneys violated ethical rules, but whether an actual conflict existed that adversely affected their performance. *See Nix v. Whiteside*, 475 U.S. 157, 165 (1986); *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (explaining that a violation of a disciplinary rule should only lead to disqualification if it taints the underlying trial). Although a lawyer's conflicts are ordinarily imputed to his or her firm based on the presumption that associated attorneys share client confidences, contrary to the Michigan ethics opinion, "attorneys with limited links to a firm are not always considered to be 'associated' with the firm for purposes of conflict imputation." *Hempstead Video*, 409 F.3d at 133 (citing, among others, *Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 224 (6th Cir. 1988) (holding that screening measures can rebut the presumption of shared confidences)). Here, in light of (1) the "thick ethical wall" between Kilpatrick's counsel and the firm; (2) the government's decision to drop all charges related to Fiore; and (3) the court's decision to appoint a fourth defense attorney to cross-examine the Macomb Drain contract witnesses, the district court plausibly determined that no actual conflict existed. Furthermore, on account of the ethical wall separating Thomas and Naughton from the O'Reilly Firm (and the physical distance between the two offices), the district court properly concluded that Kilpatrick's lawyers were not so closely associated with the O'Reilly Firm that the firm's conflict of interest should be imputed to them. *See Hempstead Video*, 409 F.3d at 132-36 (discussing the variation in "of counsel" relationships and adopting a functional approach that focuses on the substance of the relationship and the nature of the screening procedures to determine whether to impute a conflict of interest). The trial record shows that Kilpatrick's attorneys were loyal and diligent in their representation.

Kilpatrick asks us to apply the bright-line rule of presumed conflict from *Holloway v. Arkansas*, 435 U.S. 475 (1978). But the *Holloway* automatic-reversal rule only applies when "defense counsel is forced to represent codefendants over [a defendant's] timely objection, unless the trial court has determined that there is no conflict." *Mickens v. Taylor*, 535 U.S. 162, 168 (2002). In all other cases, prejudice is only presumed when "a conflict of interest *actually affected the adequacy of [the attorney's] representation*." *Id*. at 171; *see also Koste v. Dormire*, 345 F.3d 974, 982-83 (8th Cir. 2003).

Second, assuming there had been an actual conflict, Kilpatrick points to little evidence in the record that suggests his counsel did anything detrimental to his defense or failed to do something that was clearly advantageous. *See Moore*, 708 F.3d at 777. The most Kilpatrick's brief alleges is that Thomas failed to cross-examine a government witness, Derrick Miller, about Miller's conversations with Kilpatrick regarding certain city contracts. The allegation only appears in a footnote, and Kilpatrick does not explain what Thomas should have asked Miller, or why. The government argues that Miller was indeed cross-examined, but that it was done by Ferguson's counsel because the defendants' attorneys had agreed before trial to take turns cross-examining the witnesses. In any event, Thomas's failure to cross-examine Miller was not facially unreasonable or indicative of a pattern of divided loyalty that tainted the trial. *See Hempstead Video*, 409 F.3d at 132. Because Kilpatrick has not established a conflict of interest that adversely affected his lawyers' performance, his constitutional claim fails.

Kilpatrick next argues the district court failed to thoroughly investigate and resolve Thomas's and Naughton's conflicts after it was on notice of them because it "failed to take into account the nature of the conflict." When a trial court knows (or reasonably should know) that a potential conflict exists, the court has a duty to investigate the potential conflict. *Mickens*, 535 U.S. at 168.

To the extent this argument is merely a repackaging of his ineffective-assistance claim, the argument fails for the reasons stated above. The record also shows the court promptly investigated and resolved the conflict. Kilpatrick first informed the court of a potential conflict on August 7, 2012. At that point, Kilpatrick was concerned about Thomas's representation of Fiore because Fiore had alleged before a grand jury that Kilpatrick had extorted him. On

August 9, 2012, the district court ordered the parties to brief "every possible conflict" including "the conflict discussed in the [Detroit] Free Press this morning concerning the Macomb Interceptor [Drain] Drainage District." Recall that Kilpatrick knew about Thomas's and Naughton's of-counsel affiliations with the O'Reilly Firm by April 2012, when he was served with a copy of the court's order allowing Thomas and Naughton to withdraw. Nevertheless, it was the district court itself that first raised the potential O'Reilly Firm conflict after reading about it in the newspaper. The court promptly ordered briefing on the matter, heard argument on August 14, and resolved the conflict.

In his reply brief, Kilpatrick asserts that there were no facts presented to the court to support its conclusion that Thomas's and Naughton's of-counsel relationships with the O'Reilly Firm were attenuated. Although it is true that the court accepted counsel's written submissions as fact and did not hold an evidentiary hearing, Kilpatrick points to no contrary evidence. Nor does he suggest the court's findings were erroneous. In any event, this argument is best left for a motion under 28 U.S.C. § 2255. *See United States v. Ferguson*, 669 F.3d 756, 762 (6th Cir. 2012) (claims of ineffective assistance of counsel are generally addressed by collateral attack rather than on direct appeal).

## III.  CASE AGENT TESTIMONY

Kilpatrick and Ferguson challenge the lay-opinion testimony of two agents—Environmental Protection Agency Special Agent Carol Paszkiewicz and FBI Special Agent Robert Beeckman. The government never sought to qualify these agents as experts. In aggregate, they testified 23 times throughout the trial. Because the trial portended to be protracted, the government procured permission from the court to present its case in "chapters." The government used the case agents to introduce volumes of evidence at the beginning of each "chapter." The agents also interpreted the "shorthand" lingo the defendants used in their text messages, discussed some of the inner workings of the Detroit government, and explained aspects of the sewer-department contracts.

Before trial, Kilpatrick and Ferguson objected to the government's plan to use the case agents so extensively. The district court overruled these pre-trial objections, and later reaffirmed its decision in its post-trial order denying the defendants' motion for a new trial:

As revealed pretrial and at trial, during the government's investigation of Defendants' criminal conduct it had gathered about 300,000 text messages, as well as hundreds of thousands of records from the City of Detroit, municipal contractors, accountants, and financial institutions. It argued that many of these text messages were highly relevant to the jury's understanding of the facts in this criminal case but were so cryptic they often could only be understood from the context of other messages, records, and events that took place at the same time. This Court agreed. Because the text messages and recorded conversations between Defendants were communicated in an informal short-hand with little or no explanatory detail, the Court agreed that the jury would not understand these communications without some context and background that helps explain, or provides a lay opinion, as to the meaning of the abbreviations, shorthand, or nicknames used in Defendants' communications to reference individuals, companies, or business transactions. The foundation for those explanations or lay opinion was the agents' multi-year investigation and review of tens of thousands of text messages, thousands of wiretap recordings, and hundreds of records and pieces of information. It was not the agents' specialized knowledge gained from their law enforcement training, education, and experience in public corruption cases generally. Contrary to Defendants' arguments here, Agents Paszkiewicz and Beeckman did not offer sweeping conclusions or generalizations that intruded on the jury's responsibility to determine the key facts at issue and to determine whether the government had established, beyond a reasonable doubt, the elements of each charged offense. They did not offer legal conclusions that directly implicated the jury's fact-finding and decision-making functions. Rather, the case agents' lay opinion testimony was properly limited after the required foundation was established.

Kilpatrick and Ferguson challenge the admission of dozens of statements by the case agents. Essentially, they argue their case is like *United States v. Freeman*, 730 F.3d 590, 595-96 (6th Cir. 2013) (vacating a conviction for evidentiary errors concerning case agent testimony). For the reasons that follow, we find this case readily distinguishable from *Freeman* and that any evidentiary errors did not prejudice the defendants.

## A. STANDARD OF REVIEW

We review a district court's evidentiary rulings for an abuse of discretion. A court abuses its discretion when it "relies on clearly erroneous findings of fact, improperly applies the law, or employs an erroneous legal standard," or when we are "firmly convinced" that the trial court "committed a clear error of judgment." *United States v. Miner*, 774 F.3d 336, 348 (6th Cir. 2014) (internal citations omitted). When a defendant fails to object at trial, we review an evidentiary ruling for plain error. *United States v. Olano*, 507 U.S. 725, 731-32 (1993).

During trial, defense counsel lodged objections to much of the case agents' testimony. The government asks us to parse out the challenged testimony that was not subject to objection at trial, and apply plain error review.  But the defendants maintained a standing objection throughout the trial to virtually all of the agents' testimony.  We decline to review the testimony under the deferential plain error standard.

Even if the district court abused its discretion, this does not automatically result in a new trial.  Evidentiary errors remain subject to harmless error review.  Under the "harmless error" rule, Fed. R. Crim. P. 52(a), any "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."

Non-constitutional errors are subject to Rule 52(a) harmless error analysis:   the government must show *by a preponderance of the evidence* that the error did not materially affect the verdict.  *See Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946) (adopting this "substantially swayed" test for non-constitutional errors); *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 510 (6th Cir. 2013), *cert. denied*, 134 S. Ct. 935 (2014); *see also generally* 2 Handbook of Fed. Evid. § 103:1 (7th ed.); 7 Crim. Proc. § 27.6(a)-(e) (3d ed.).  In contrast, when an error of *constitutional* magnitude occurs, the government must prove *beyond a reasonable doubt* that the error did not affect the verdict.  *Miner*, 774 F.3d at 342, 350 (differentiating the harmless error standard of review for a constitutional error—an erroneous jury instruction—from a non-constitutional evidentiary error).[2]  In non-constitutional evidentiary-error cases like this one, when the record is "so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error," the judgment must be reversed.  *O'Neal v. McAninch*, 513 U.S. 432, 437-38 (1995).  The scale, if equal, tips in favor of the defendant.  *Ruelas v. Wolfenbarger*, 580 F.3d 403, 413 (6th Cir. 2009).

---

[2]In *United States v. Baldwin*, a case that involved improper character evidence (a non-constitutional error), we mistakenly stated, "An error is harmless 'when it appears *beyond a reasonable doubt* that the error complained of did not contribute to the verdict obtained.'"  418 F.3d 575, 582 (6th Cir. 2005) (emphasis added) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003)).  But we left out the crucial word "constitutional."  The Supreme Court in *Esparza* actually said, "A *constitutional* error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Esparza*, 540 U.S. at 17-18 (quoting *Chapman v. California*, 386 U.S. 18, 24 (2003)) (emphasis added, internal quotation marks omitted).  Several opinions have followed *Baldwin* on this point.  *See, e.g., Freeman*, 730 F.3d at 595; *United States v. Lopez-Medina*, 461 F.3d 724, 741 (6th Cir. 2006).

## B.  LEGAL FRAMEWORK

Kilpatrick and Ferguson argue that the case agents violated the lay opinion testimony rule, Federal Rule of Evidence 701, by summarizing evidence and interpreting text messages, phone calls, and other documents.  Courts often qualify law enforcement officers as *expert witnesses* under Rule 702 to interpret intercepted conversations that use "slang, street language, and the jargon of the illegal drug trade." *United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001).  In contrast, when an officer is *not* qualified as an expert, the officer's lay opinion is admissible "only when the law enforcement officer is a participant in the conversation, has personal knowledge of the facts being related in the conversation, or observed the conversations as they occurred." *Id*.  This rule is derived from Rule 701, which states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a)  rationally based on the witness's perception;
> (b)  helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c)  not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

The party offering testimony under Rule 701 must establish that all three requirements are satisfied.  *Freeman*, 730 F.3d at 595-96.  The function of lay opinion testimony is to "describ[e] something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event." *Id*. at 595 (quoting *United States v. Jayyousi*, 657 F.3d 1085, 1120 (11th Cir. 2011) (Barkett, J., concurring in part and dissenting in part)); *see also United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005) (describing lay opinion testimony as an acceptable shorthand for the rendition of facts the witness personally perceived).

Several recent cases have explored the boundaries of lay opinion testimony by law enforcement officers who interpret intercepted communications for the jury.  On one hand, "an investigator who has accumulated months or even years of experience with the events, places, and individuals involved in an investigation necessarily draws on that knowledge when testifying; indeed, it is those out-of-court experiences that make the witness's testimony helpful

to the jury." *United States v. Gadson*, 763 F.3d 1189, 1209 (9th Cir. 2014). On the other hand, testimony of this type also poses dangers.

In *Freeman*, we addressed the extent to which agents may give lay opinion testimony that interprets intercepted conversations when the agents base their interpretations on the collective knowledge that the agency obtained through the course of the investigation. We explored the "risk" that when an agent "provides interpretations of recorded conversations based on his knowledge of the entire investigation," the agent could impermissibly testify "based upon information not before the jury, including hearsay," and that the jury might think the agent is privy to important knowledge about the case that the jury lacks. *Freeman*, 730 F.3d at 596 (quoting *United States v. Hampton*, 718 F.3d 978, 983 (D.C. Cir. 2013)). The risks are that the agent (1) could "effectively smuggle in inadmissible evidence," (2) may draw the kind of inferences that counsel may draw in closing argument, but with "the imprimatur of testifying as a law enforcement officer," (3) could "usurp the jury's function," or (4) may be "doing nothing more than speculating." *Id.* (quoting *United States v. Albertelli*, 687 F.3d 439, 447 (1st Cir. 2012)). Accordingly, a trial court must ensure that the testimony hews to Rule 701's limitations.

In *Freeman*, the testifying agent "repeatedly substantiated his responses and inferences with generic information and references to the investigation as a whole." *Id.* This ran afoul of Rule 701(a) because the agent "never specified *personal* experiences that led him to obtain his information but, instead, repeatedly relied on the general knowledge of the FBI and the investigation as a whole." These vague references to the "investigation as a whole" left the jury "in the dark" regarding the sources of the agent's information. *Id.* The agent never testified that he was present for any surveillance, or even that he observed any activity relevant to interpreting the wiretapped phone calls. *Id.* at 597. Because the agent never specified his sources or cited his personal experiences, we were left to infer that "he was expressing an opinion informed by all the evidence gleaned by various agents in the course of the investigation and not limiting himself to his own personal perceptions." *Id.* at 596 (quoting *Garcia*, 413 F.3d at 213); *see also United States v. Miller*, 738 F.3d 361, 373 (D.C. Cir. 2013) (finding plain error when the agents interpreted phone conversations without specifying the "bases (events, other calls, seizures of contraband, etc.) upon which their opinions rested—other than broad claims about knowledge

they had gained from the investigation"). The testimony in *Freeman* was so egregious that the government conceded at oral argument that the agent "lacked the first-hand knowledge required to lay a sufficient foundation for his testimony under Rule 701(a)." 730 F.3d at 597.

In addition to the agent's failure to limit his testimony to his own "sensory and experiential observations" under Rule 701(a), *id*. at 595, the testimony in *Freeman* also ran afoul of Rule 701(b)'s helpfulness requirement. It is not "helpful" when a witness, lay or expert, forms conclusions for a jury that the jurors are competent to reach on their own. *Id*. at 597. To "merely tell the jury what result to reach" violates the rule. *Id*. The agent in *Freeman* "effectively spoon-fed his interpretations of the phone calls and the government's theory of the case to the jury, interpreting even ordinary English language." *Id*.; *see also Peoples*, 250 F.3d at 640 (reversing when the officer's lay opinion testimony constituted several hours of "a narrative gloss that consisted almost entirely of her personal opinions of what the [recorded] conversations meant"). Nor is it helpful for a lay opinion witness to speculate or to repeat previously-admitted evidence that requires no explanation. *Freeman*, 730 F.3d at 597 (citing *United States v. Freeman*, 498 F.3d 893, 905 (9th Cir. 2007)). When it comes to interpreting language from intercepted communications, an agent can be helpful when she uses her personal knowledge of the case to interpret cryptic language. *Id*. at 598. But a case agent testifying as a lay witness "may not explain to a jury what inferences to draw from recorded conversations involving ordinary language" because this crosses the line from evidence to argument. *Id*.

Other boundaries also apply under Rule 701(b). Lay opinion witnesses should avoid expressing a conclusion that the defendant is guilty. *Garcia*, 413 F.3d at 210, 213 (noting that, while under Rule 704, a lay opinion is not inadmissible simply because "it embraces an ultimate issue," courts should "be wary" of opinion testimony whose "sole function" is to answer the ultimate question of guilt). *But see Gadson*, 763 F.3d at 1213-14 (holding that the district court did not plainly err in allowing an officer who testified purely as a lay witness to state his opinion that the defendant was guilty). An agent may not, at the beginning of trial, provide a summary of evidence that has not yet been admitted. *Albertelli*, 687 F.3d at 449; *Garcia*, 413 F.3d at 210-11, 214; Fed. R. Evid. 602. The law provides a place for such summaries and conclusions—in the opening statement and closing argument. There is also a danger when opinion testimony "relies

on or conveys hearsay evidence, such as when an officer relies on the truth of a third party's statement as the basis for an interpretation of a statement in an intercepted phone call." *Gadson*, 763 F.3d at 1208.

The third requirement, stated in Rule 701(c), is designed to "prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements set forth in Fed. R. Crim. P. 16 and Fed. R. Civ. P. 26." *Garcia*, 413 F.3d at 215. If the opinion testimony draws on scientific, technical, or other specialized knowledge, then its admissibility should be assessed under Rule 702, not Rule 701. *Id.*

## C. ANALYSIS

Kilpatrick and Ferguson argue that this case is like *Freeman*, 730 F.3d at 590. It is not.

First, unlike *Freeman*, the agents in this case established a personal-knowledge basis for their lay opinion testimony. They did not merely cite to the collective knowledge of their respective agencies as the source of their information. Each agent testified on multiple occasions concerning his or her years-long personal involvement in the case, including interviewing dozens of witnesses, reading scores of relevant documents and thousands of text messages, and listening to recorded phone calls. This was not a case in which the agents lacked first-hand personal knowledge of key aspects of their testimony.

Second, few of the challenged statements could be characterized as (1) arguing the government's case or (2) offering interpretations of plain English language, which were issues in *Freeman*. In fact, a great deal of the challenged testimony does not implicate Rule 701 or *Freeman* at all. Some of the testimony is simply admissible background material. Agents are permitted to testify regarding how they became involved in a case, what allegations they were investigating, who the suspects were, and similar background. *United States v. Goosby*, 523 F.3d 632, 638 (6th Cir. 2008); *United States v. Aguwa*, 123 F.3d 418, 421 (6th Cir. 1997) (citing *United States v. Evans*, 883 F.2d 496, 501 (6th Cir. 1989)). This sort of testimony, which is designed to set the stage for the introduction of evidence, differs substantively from problematic

"preview testimony" that "purports to sum up (in advance of the evidence) the government's overall case." *Albertelli*, 687 F.3d at 449.

To provide an example, the government asked Agent Paszkiewicz on October 24, 2012, to describe her role in the investigation:

> A. I was one of the principal agents investigating allegations of extortion by members of the Kilpatrick administration in the awarding of Detroit Water and Sewerage Department contracts.
>
> Q. What do you mean by that, what were you exactly investigating in that regard?
>
> A. Allegations that contractors to the Detroit Water and Sewerage Department were either forced to have certain partnerships in contracts, were made to make what we call no-show payments on contracts and bid rigging and contract steering by various members of either [the] Detroit Water and Sewerage Department or the mayoral administration.
>
> Q. And when you say "forced," what do you mean?
>
> A. Well, that they were, that these contractors, whether or not they had a fear or belief that if they didn't do the things I mentioned, specifically the forced partnerships or the making of the no-show payments . . . . that they would have negative repercussions . . . .

Defense counsel objected that the agent was supplying legal definitions and arguing the government's case. But the court explained:

> I think this is a complicated case that has a lot of different charges, that it will be very difficult for the jury to recall from the original opening statements, which are already like six or eight weeks ago, and if she's explaining what her investigation encompassed, that's entirely proper.

Another example occurred the following day, when the same agent testified:

> Q. Now, did you investigate whether African American contractors, as part of your case, suffered financial consequences as a result of alleged efforts by the administration to give contracts to Bobby Ferguson?
>
> A. Yes.
>
> Q. And that included lost city contracts?
>
> A. Yes.
>
> Q. Contracts that were canceled that were awarded to African American contractors?
>
> A. That were initially awarded, yes.

Q. And payment by African American contractors to Mr. Ferguson for work that he didn't do?
A. Yes.
Q. And instances in which African American contractors were forced to enter into agreements and contracts with Mr. Ferguson in the city contracts?
A. Yes.

The agent simply explained what allegations she *investigated*. She did not offer conclusions or impermissibly argue the government's case. Explaining the allegations underlying an investigation does not implicate Rule 701 or *Freeman*.

It is also permissible for an agent who has reviewed the evidence to testify concerning what the evidence does not contain. For example, Kilpatrick and Ferguson objected when the government asked Agent Paszkiewicz whether Kilpatrick sent text messages to any contractor besides Ferguson, and she answered "no." But a witness may testify that the dog didn't bark. A witness who has examined the records may testify that no record "of a specific tenor is there contained." *United States v. Scales*, 594 F.2d 558, 562 (6th Cir. 1979) (quoting 4 Wigmore, Evidence § 1230 (Chadbourn rev. 1972)); *see also* McCormick on Evidence § 234 (2013). Testifying to the absence of evidence also does not implicate Rule 701 or *Freeman*.

Another consideration is that, especially in a complicated trial, a witness may make short "framing" references to previously-admitted evidence. Contrary to the defendants' argument, it was not error for the government to ask the case agents whether they recalled certain details of prior witnesses' testimony. These short framing questions tied the evidence together in a manner that was helpful to the jury. *See United States v. Smith*, 601 F.3d 530, 540 (6th Cir. 2010) (permitting summary-reference testimony in complex cases where the volume of evidence is "plausibly confusing to the jury").

The Rules also allow a witness to summarize voluminous writings or recordings. Under Federal Rule of Evidence 1006, a party may "use a summary . . . to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court," provided that the other party has been given an opportunity to examine the entire record. "[T]he *point* of Rule 1006 is to avoid introducing all the documents." *United States v. Faulkenberry*, 614 F.3d 573, 588-89 (6th Cir. 2010) (quoting *United States v. Hemphill*, 514 F.3d 1350, 1359

(D.C. Cir. 2008)).  Because both parties possess the entire collection of recordings or writings, Rule 1006 witnesses can be cross-examined about the accuracy of their summaries.

In this case, when the agents explained their interpretations of ambiguous statements and the workings of the Detroit government, they sometimes relied on groups of "surrounding text messages" or their review of documents and interviews of witnesses as the basis for their interpretations and identifications.  Only 151 out of about 370,000 subpoenaed text messages were shown to the jury.  But, because the defendants had access to all the evidence cited by the agents, they were free to challenge the accuracy of any summary testimony through cross-examination.

The defendants challenge an instance in which an agent was reading a document and made an error that was later corrected.  But agents are free to read aloud from admitted documents, even if there are minor discrepancies between the written and spoken texts.  *United States v. Tragas*, 727 F.3d 610, 614 (6th Cir. 2013).

Several of the challenged statements in this case concern "identifications."  The agents supplied names for nicknames, identified people's jobs or relationships, and explained, for example, which city contract was being discussed in which text message.  As the First Circuit explained in *Albertelli*, defendants who challenge a lay witness's identification testimony on appeal should state some claim that the identification was faulty or debatable, and show how the answer was prejudicial.  687 F.3d at 449.

One illustrative example of an identification derived from summary evidence occurred when the government tried to establish a foundation for Agent Beeckman's explanation that the "boss" to whom city employee Vincent Anwunah referred in his text messages was Ferguson. Agent Beeckman said the identification was based on his review of "other text messages" between Anwunah and Ferguson.

To provide another example, on October 24, Agent Paszkiewicz was asked, over a standing objection, to interpret a message from Ferguson to Kilpatrick.  It said, "You're welcome, boss. Just left Victor.  The date has been changed . . . to my benefit but we still have problem on the big one.  He thinks he is slick, man, with this [sic] white folks."  The agent

testified that the three lowest bidders on the project in question were "majority-owned" and that, based on her "review of the surrounding text messages," "the big one" was city contract number CM-2012. This was essentially identification testimony. And we believe it was admissible under Rule 701.

Here, based on her investigation, Agent Paszkiewicz gained first-hand knowledge of which contractors were majority- or minority-owned. Her first-hand examination of the text messages enabled her to opine that "the big one" was a particular contract. These interpretations were helpful to the jury and not based on specialized knowledge. The difficulty in this example is that (unlike many of the challenged identifications), it is not clear whether other evidence that was submitted to the jury would have confirmed the identifications. If this were Rule 1006 summary evidence, this would not be a problem. Rule 1006 does not require that the summarized records be submitted to the jury. But some Rule 701 cases have found error when an agent references evidence (e.g., "surrounding text messages") that is not before the jury. *See, e.g.*, *Hampton*, 718 F.3d at 983 (stating that when an agent based his interpretation on "all of the calls," but only 100 of 20,000 calls were admitted into evidence, it raised the "specter" that the verdict could be influenced by information outside the evidence).

Nevertheless, Kilpatrick and Ferguson do not contest the accuracy of these identifications or explain how they were otherwise prejudicial. *See Albertelli*, 687 F.3d at 449. If the defense had reason to believe that the bidders were minority owned, or that "the big one" was something other than CM-2012, they could have cross-examined the agent. *See United States v. Etienne*, 772 F.3d 907, 920 (1st Cir. 2014) (finding that the opportunity to cross-examine an agent concerning his voice identifications was adequate protection for the defendant's "substantial rights"). Given that Kilpatrick and Ferguson do not argue that these identifications (of someone's name, family relationship, job title, or job function, for example) were inaccurate, debatable, or prejudicial, we have no basis for finding harmful error.

Furthermore, Kilpatrick and Ferguson waived their challenge to many of these identifications. The parties agreed before trial that the agents could, relying on surrounding text messages, clarify terms such as nicknames, abbreviates, acronyms, and so on.

Finally, Kilpatrick and Ferguson allege that the case agents' testimony occasionally strayed into expert testimony. When an agent gives opinions that rely on the agent's specialized training as a law enforcement officer, that testimony is expert testimony, and the agent must be qualified under Rule 702. *See Garcia*, 413 F.3d at 215-17. However, when an agent relies on his or her personal knowledge of a particular investigation, the agent's opinion may be lay opinion testimony under Rule 701. *See Albertelli*, 687 F.3d at 446-48; *United States v. Rollins*, 544 F.3d 820, 830-33 (7th Cir. 2008).

For instance, Agent Beeckman testified that the standard oversight fee for Detroit sewer department contracts was five percent. The defendants objected, and the court held a sidebar. At the sidebar, the government pointed out that the discovery materials contained several "boilerplate" contracts, each of which contained this five percent fee. Kilpatrick and Ferguson do not repudiate this observation. It was not an abuse of discretion for the district court to conclude that mentioning the five percent standard fee was not expert testimony because a layperson could glean this information by reviewing the contracts. *See Garcia*, 413 F.3d at 215 ("[A] lay opinion must be the product of reasoning processes familiar to the average person in everyday life."). Again, Kilpatrick and Ferguson do not challenge the accuracy of the statement. Even assuming that the reference to the oversight fee was not proper under Rule 701 or 1006 (to which the government now cites), any error would be harmless.

Another such incident occurred when Agent Beeckman referred to a casino owner and said that "the law is that you can't make any political contributions if you have a casino vendor license." At another point, Agent Beeckman explained that the Kilpatrick Civic Fund was a "501(c)(4), public welfare organization, tax-exempt nonprofit organization" authorized by the IRS to solicit donations for public welfare purposes. Agent Beeckman further explained that a § 501(c)(4) entity could not legally contribute to a political campaign.

Although these references to laws and regulations had the ring of expert testimony or legal argument, one could also conclude that a layperson who studied the discovery materials (which included, for example, the Kilpatrick Civic Fund's articles of incorporation, a Detroit government organizational chart, dozens of contracts, thousands of text messages, and numerous witness interviews) would have learned the basic contours of what it means to be a § 501(c)(4)

corporation and the campaign contribution limitations of certain organizations. *See, e.g.*, Fed. R. Evid. 701 Advisory Committee Notes to 2000 Amendments ("[T]he distinction between lay and expert witness testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" (quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992))). Even if this testimony crossed the line into expert testimony, Kilpatrick and Ferguson have not alleged the statements were inaccurate or prejudicial. The same can be said of other challenged testimony, which included an agent's description of the city's process for approving a contract, an agent's description of Kilpatrick's role as "special administrator" for the sewer department, and an explanation of a city executive order giving preference to Detroit-based businesses.

At argument, we asked Ferguson's attorney to identify the most egregious errors in admitting the case agents' testimony. Ferguson's counsel alleged several errors, but did not argue they contained inaccuracies or explain how they harmed her client. Nor did counsel identify any inadmissible evidence smuggled in through the agents' opinion testimony. We conclude that error, if any, in admitting the case agents' testimony was harmless.

## IV. "FEAR" EVIDENCE

Kilpatrick joins Ferguson's argument that the district court erred by allowing witnesses to recount statements made to them by others for the purpose of establishing the witnesses' fear of Kilpatrick and Ferguson. The defendants point to testimony by five witnesses and specify that they objected to each statement at trial. Ferguson and Kilpatrick say these statements were inadmissible hearsay. The government counters that the statements were not hearsay because they were not admitted for the truth of their content. Instead, the statements were admitted as circumstantial evidence of the extortion victims' fear. The federal code defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

A statement is only hearsay if it is offered to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c). If an out-of-court statement is offered purely to show the

statement's effect on the hearer, then this usage is not hearsay. *See United States v. Williams*, 952 F.2d 1504, 1517-18 (6th Cir. 1991).

In extortion cases, statements by the victim indicating fear of the defendant are admissible to prove the "force or fear" element of extortion. *See, e.g.*, *United States v. Kelly*, 722 F.2d 873, 877-78 (1st Cir. 1983); *United States v. Tuchow*, 768 F.2d 855, 865-67 (7th Cir. 1985).

> The victim's fearful state of mind is a crucial element in proving extortion. The testimony of victims as to what others said to them, and the testimony of others as to what they said to victims is admitted not for the truth of the information in the statements but for the fact that the victim heard them and that they would have tended to produce fear in his mind.

*United States v. Hyde*, 448 F.2d 815, 845 (5th Cir. 1971); *see also Williams*, 952 F.2d at 1518. Because such fear-illustrating statements also often refer to acts of the defendant, courts should, upon request, instruct the jury that such statements may only be used as evidence of fear, not evidence of the defendant's acts. *See United States v. Collins*, 78 F.3d 1021, 1036 (6th Cir. 1996). The evidence "may not be used to show that the defendants in fact made threats or otherwise made use of such fear." *Hyde*, 448 F.2d at 845.

Such "fear" evidence in extortion cases is similar to, but distinguishable from, evidence admissible under the hearsay exception at Federal Rule of Evidence 803(3). Rule 803(3) allows witnesses to recount hearsay statements (that is, statements offered to prove the truth of the statements' factual content) when the statement's original declarant is expressing his or her then-existing state of mind. In this case, the district court admitted some statements under Rule 803(3) and some statements under the *Williams-Collins* rule for extortion cases. The difference is this: when the out-of-court statement is an expression of fear being offered to prove the existence of the fear expressed in the statement, this is a hearsay statement that may be admissible under Rule 803(3). When, however, the statement is not the victim/declarant's expression of his or her own fear, but a statement made to (or in the presence of) the victim by someone else that would tend to be a fear-inducing statement, such evidence is not hearsay.

Ferguson's brief challenges ten discrete snippets of testimony. We will focus on the two that appear to be the defendants' strongest case. Whereas most of the challenged out-of-court

statements were made by people who themselves were also testifying witnesses at trial, these two pieces of testimony contained statements by people who did not testify at trial. Because the declarants themselves were not available for cross-examination regarding these two out-of-court statements, any error in admitting the out-of-court statements would be less likely to be harmless.

The first example is from the December 19, 2012 testimony of Bernard Parker, an employee for a subcontractor in one of the disputed sewer contracts. Parker recounted what his colleague Tim Tousignant said to him about Ferguson's insinuations that Kilpatrick would prevent a contract amendment from passing if Parker's firm did not kowtow to his demands:

> Q. Okay. And what was Mr. Tousignant's reaction?
> A. That this is extortion, he felt blackmailed.

Parker's testimony was essentially that Tousignant said, "This is extortion, I feel blackmailed." Clearly, this would be inadmissible to prove the truth of the matter asserted. However, the statement also fits squarely within the *Williams-Collins* rule. As we explained in *Williams*, "testimony of victims as to what others said to them [is admissible to show] the fact that the victim heard them and that they would have tended to produce fear in his mind." *Williams*, 952 F.2d at 1518.

This analysis also applies to Parker's testimony from later the same day. As Ferguson's brief explains it:

> The court permitted, over objection, Parker to testify that [Parker's colleagues from another company, Walbridge,] Penrod and Hausmann told him that they included Mr. Ferguson because "they were worried they weren't going to get the project."

Here, the statement at issue from Parker's colleagues was essentially, "we are worried we're going to lose the project if we don't do what Ferguson wants." Such statements are admissible under the *Williams-Collins* rule because Parker heard them, and they would have tended to produce fear of economic harm.

The district court did at times give limiting instructions concerning out-of-court statements. Regarding one of the statements Ferguson now challenges, the court instructed:

> And I should just tell the jury that I have ruled that the statements that [the government] is about to elicit are admissible, but you should understand that they're not admitted for the truth of what those statements are. In other words, he's going to ask [the witness] what [another person] said, and they're not offered for the truth of what she said, but just to establish the witness's state of mind for what he did on this contract.

Before the trial resumed on December 20, 2012, the district court held a conference with the attorneys concerning these hearsay objections. The court explained its reliance on *Williams* and *Collins* and assured defense counsel that the court would give a limiting instruction whenever counsel requested it. And the court gave evidentiary limiting instructions on several occasions. The court also sustained several hearsay objections during trial. The court was careful to distinguish between Rule 803(3) statements and non-hearsay statements. Under these circumstances, we find no abuse of discretion in the district court's decision to admit the challenged statements under the *Williams-Collins* rule.

Ferguson argues that the court's limiting instructions were insufficient. However, the district court offered to give the jury *Williams* instructions upon request, but defense counsel failed to request them. Counsel cannot now complain about the adequacy of the limiting instructions when they waived their opportunity to elicit more extensive instructions at trial. *See Collins*, 78 F.3d at 1036.

## V. RESTITUTION

Kilpatrick alleges two sentencing errors. First, he claims the court incorrectly calculated restitution to the Detroit Water & Sewerage Department (DWSD) based on his gain rather than the DWSD's loss. Second, he asserts that restitution to the IRS was not authorized by law. We review de novo whether restitution is permitted under the law. If it is authorized, we then review the award for an abuse of discretion. *United States v. Butler*, 297 F.3d 505, 516 (6th Cir. 2002); *United States v. Comer*, 93 F.3d 1271, 1278 (6th Cir. 1996).

### A.

Under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, when setting a sentence for a property crime, the court "shall order . . . that the defendant make restitution to the victim of the offense." Congress's intent in passing the MVRA was that "courts

order full restitution to all identifiable victims of covered offenses, while guaranteeing that the sentencing phase[s] of criminal trials do not become fora for the determination of facts and issues better suited to civil proceedings." *United States v. Ferdman*, 779 F.3d 1129, 1133 (10th Cir. 2015) (quoting S. Rep. No. 104-179, at 189 (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 931).

Restitution "is intended to compensate victims only for losses caused by the conduct underlying the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 416 (1990). Accordingly, restitution "must be based on the victim's loss rather than the offender's gain." *United States v. George*, 403 F.3d 470, 474 (7th Cir. 2005). "The circuit courts of appeals are in general agreement that the defendant's gain is not an appropriate measure of the victim's actual loss in MVRA calculations." *United States v. Fair*, 699 F.3d 508, 513 (D.C. Cir. 2012) (collecting cases). The government bears the burden of proving a victim's actual loss by a preponderance of the evidence. *United States v. Zangari*, 677 F.3d 86, 92 (2d Cir. 2012) (citing 18 U.S.C. § 3664(e)). Although the MVRA does not require courts to calculate restitution with *exact* precision, *some* precision is required—"[s]peculation and rough justice are not permitted." *Ferdman*, 779 F.3d at 1133 (quoting *United States v. Anderson,* 741 F.3d 938, 954 (9th Cir. 2013)).

If the trial evidence and presentence report are insufficient to establish the proper amount of restitution, the court "may require additional documentation or hear testimony." 18 U.S.C. § 3664(d)(4); *George*, 403 F.3d at 474 (remanding with instructions for the district court to receive written submissions from the parties to establish the victim's loss amount). The court may also refer the issue "to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition." 18 U.S.C. § 3664(d)(6). Furthermore, if the court finds that "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process," the court may forgo restitution. *Id.* § 3663A(c)(3)(B); *see also Ferdman*, 779 F.3d at 1133.

In the present case, the district court ordered Kilpatrick to pay restitution to the DWSD in the amount of $4,584,423—the amount the government sought. This dollar figure originated

from the Probation Department's calculations (for Guidelines range purposes) of the defendants' profits from the contracts that underlie the RICO and extortion counts.  In the government's first memorandum regarding forfeiture and restitution, it characterized this figure as reflecting "the *minimum* profits from the extorted and steered contracts."  In its subsequent memorandum on restitution, the government claimed this amount was "based upon an overall 10% profit margin for the contracts at issue" in the RICO and extortion counts.  This amount, the government said, represented "a reasoned approximation of the amount of money the City of Detroit was unknowingly forced to spend for contracts obtained through fraud and deceit."  The government explained it would be "impracticable to rebid the contracts, undo the work performed and determine the amount that the City of Detroit should have been charged for these projects."  Accordingly, the government argued, this "reasoned approximation" was, under the circumstances, the government's best guess as to the city's actual losses to the defendants' scheme.

At the subsequent hearing on restitution and forfeiture, the government argued that although "Ferguson's company did provide some services under the contracts, the desired goal of the City in having a truthful bidding process was completely corrupted."  Accordingly, Ferguson's performance did not provide the "consideration" for which the city bargained.  The government claimed its $4.5 million figure was "a reasonable approximation" and a "conservative approximation" of "the difference between the services rendered and what the City anticipated getting from a contractor who did not obtain the contract by extortion."  The government urged the court to adopt this figure because the "actual loss" to the city would be "inherently difficult to precisely quantify."

In response, Kilpatrick pointed out that the Probation Department generated its ten-percent loss calculation to determine the defendants' "excessive gain" for the purpose of establishing the proper Guidelines sentence—not to determine the city's loss.  The court then asked:

> If the four million plus that was determined to be the operative figure for sentencing guidelines purposes represented at least approximately the gain to which Mr. Ferguson was not entitled and for which he was accountable under the RICO statute, how is that not translatable into a loss for the City?  If he gained $4 million to which he was not entitled, where should that $4 million have gone?  I

mean, maybe it should have gone to the contractors, but I don't have that to sort
out in front of me today anyway.

Kilpatrick's counsel responded that it was legally "necessary to look at whether or not the City was benefited." Kilpatrick argued that the government failed to prove the city lost any money. He asserted the government did nothing to prove that the city paid more to Ferguson than it would have paid to a competitor. In fact, Ferguson's companies did perform some of the work and provided a benefit to the city. The figures in the presentence report, Kilpatrick argued, reflected none of these considerations.

> Nevertheless, the court adopted the government's restitution figure, and explained:

> I don't think there is any way to parse out what the actual loss was as opposed to the improper gain. The law does not require that these numbers be determined with exactness and specificity because it is impossible to do that in hindsight, in many cases more than ten years after the fact.
> ****
> Again, I think the $4,584,000 figure is a conservative and accurate figure based on the defendants' own records, and that is the number I'm going to use for restitution.

Other circuits have confronted situations like this one, and found that the district court abused its discretion. For example, *United States v. Harvey* involved contracts procured through bribery and fraud. Because the government provided "no evidence" of the victim's "actual loss" amounts, the district court used the eight-percent profit margin the defendant earned on the contracts "as a proxy for actual loss." 532 F.3d 326, 340 (4th Cir. 2008). The Fourth Circuit Court of Appeals held it was error for the district court to use "gain to approximate the amount of actual loss." *Id.* at 341. "[A]ny order of restitution," the court held, "must be based on sufficient evidence of the amount of actual loss incurred as a result of the fraudulently obtained contract. Profit gained by the defendants may not be used in its stead." *Id.*

Likewise, the court in *United States v. Gallant* held that using the defendants' gain "as a measure of loss . . . cannot satisfy the district court's responsibilities unless the court has first attempted to determine with some degree of certainty the general amount of loss . . . attributable to the defendants' criminal conduct and concluded that the defendants' gain corresponds to that amount." 537 F.3d 1202, 1238 (10th Cir. 2008) (quoting *United States v. Haddock*, 12 F.3d 950,

961 (10th Cir. 1993)) (internal quotation marks and alterations omitted).  Instead, "a defendant's gain may only be used as a measure of loss" when it is a "reasonable estimate" of the loss.  *Id.* And, when the defendant's gain "significantly overestimates loss" or "significantly underestimates it," the gain is not a "reasonable estimate."  *Gallant*, 537 F.3d at 1238-39; *see also United States v. Galloway*, 509 F.3d 1246, 1253 (10th Cir. 2007) (holding that the district court abused its discretion when it used the defendant's gain as an "estimate" for the victim's loss).

"To be sure, there may be cases where there is a direct correlation between gain and loss, such that the defendant's gain can act as a *measure* of—as opposed to a *substitute* for—the victim's loss."  *Zangari*, 677 F.3d at 93 (citing *United States v. Berardini,* 112 F.3d 606, 609-10 (2d Cir. 1997)).  But before a court can convert the amount of a defendant's gain into the amount of the victim's loss, the government must establish a "direct correlation" between the two. *Zangari*, 677 F.3d at 93; *see also Fair*, 699 F.3d at 513-14 (recognizing that this may require "additional evidentiary proceedings").

Upon considering these precedents from other circuits, we are unable to uphold the restitution award.  The government essentially conceded that its $4.5 million figure did not represent the city's "actual loss."  And the district court correctly observed that absent the defendants' extortion, a large portion of that city money would have gone to other contractors (who ostensibly would be additional victims).  The government claimed the "actual loss" would be "inherently difficult to precisely qualify," and the court recognized it lacked any data regarding what the DWSD would have paid to other contractors if the bidding had not been rigged.  It appears that the court, like the district court in *United States v. Navarrete*, 667 F.3d 886, 891 (7th Cir. 2012), "threw up [its] hands too soon."

We recognize the dilemma the district court faced—especially because we have not previously provided guidance on this issue.  But the consensus among our sister circuits compels us to conclude that a district court may not use the defendant's gain to approximate the victim's loss unless the government establishes such a correlation that the defendant's gain can act as a measure of—not a substitute for—the victim's loss.  *Zangari*, 677 F.3d at 93.  Accordingly, we vacate the district court's restitution award against Kilpatrick to the DWSD and remand for

further proceedings limited to the restitution award. On remand, the district court may (1) request the government to submit additional evidence; (2) hold an evidentiary hearing; and (3) conduct further proceedings limited to the restitution award consistent with this opinion. *See* 18 U.S.C. §§ 3663A(c)(3)(B), 3664(d)(4), (d)(6); *Ferdman*, 779 F.3d at 1133.[3]

## B.

Kilpatrick also argues that the district court erred in ordering him to pay $195,403.61 as restitution to the IRS for unpaid taxes. The federal restitution statutes do not authorize restitution for tax crimes under Title 26. *See United States v. Butler*, 297 F.3d 505, 518 (6th Cir. 2002).

However, the law gives courts wide discretion in ordering restitution as a condition of supervised release. "[T]he Supervised Release Statute [18 U.S.C. §3583(d)], together with the Probation Statute [18 U.S.C. § 3563], unambiguously authorizes federal courts to order restitution as a condition of supervised release for *any* criminal offense, including one under Title 26, for which supervised release is properly imposed." *United States v. Batson*, 608 F.3d 630, 635 (9th Cir. 2010); *see also United States v. Hassebrock*, 663 F.3d 906, 923-24 (7th Cir. 2011).

At the sentencing hearing for restitution and forfeiture, the district court initially stated that Kilpatrick's restitution to the IRS was "collectable under 18 U.S.C. § 3663A." When one of the government's attorneys questioned this conclusion, the court stated: "I'll do it in the alternative as a condition of supervised release. . . . [I]f for some reason the statute is found by the Court of Appeals not to authorize a restitution award, I would alternatively award it as a condition of supervised release." Accordingly, the court included its instructions for the IRS payments in the judgment's "Special Conditions of Supervision." The district court did not err when it ordered Kilpatrick to pay his unpaid taxes as a condition of his supervised release.

---

[3]The record as it exists contains some evidence the district court may use to establish actual loss. Regarding contract CM-2014, the subject of Count 9, the jury heard testimony regarding the winning bid amount both before and after the bidding process was manipulated in Ferguson's favor. Specifically, the second winning bid was $1,520,653.50 greater than the first.

**VI.**

We **AFFIRM** Kilpatrick's and Ferguson's convictions and sentences. However, we **VACATE** the district court's restitution award against Kilpatrick to the Detroit Water & Sewerage Department and **REMAND** for proper calculation of the award.