RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0284p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

CLAYTON HALL (20-4128); GREGORY D. FRANKLIN, II
(20-4144),

*Defendants-Appellants.*

⎤
⎟
⎟
⎟
⎟
⎟
> Nos. 20-4128/4144
⎟
⎟
⎟
⎟
⎟
⎦

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:19-cr-00330—Donald C. Nugent, District Judge.

Argued:  October 19, 2021

Decided and Filed:  December 16, 2021

Before:  GILMAN, THAPAR, and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  James A. Jenkins, Cleveland, Ohio, for Appellant in 20-4128.  Jaime P. Serrat, Cleveland, Ohio, for Appellant in 20-4144.  Bryson N. Gillard, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.  **ON BRIEF:**  James A. Jenkins, Cleveland, Ohio, for Appellant in 20-4128.  Jaime P. Serrat, Marisa L. Serrat, Cleveland, Ohio, for Appellant in 20-4144.  Bryson N. Gillard, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge.   Clayton Hall and Gregory Franklin, II were convicted by a jury for engaging in a drug-trafficking conspiracy.   The district court then sentenced each of them to a 360-month term of imprisonment.   They collectively raise six issues on appeal, ranging from Hall's challenge to the composition of the jury to the sufficiency of the evidence against Franklin.   For the reasons set forth below, we conclude that none of the claims have merit.   We therefore AFFIRM the judgment of the district court.

## I.  BACKGROUND

### A.     Factual background

This case began with an investigation of Hall by the Cleveland Police Department in October 2018.   Having received a tip concerning Hall's alleged drug trafficking during that month, officers arranged for a controlled buy from Hall at his residence.   A confidential informant (CI), operating under the officers' guidance, called Hall at a phone number ending in "9712" to make the purchase.   On October 24, 2018, the CI purchased drugs from Hall.   The day after the controlled buy, officers obtained and executed a search warrant for Hall's Cleveland residence.   They recovered various drugs, drug paraphernalia, and cash.   The officers involved in the execution of the search warrant included Detective William Salupo and Detective Lawrence Smith.   Hall was not present during the search, and the record does not indicate that he was contemporaneously arrested.

This cycle was repeated in November 2018.   A CI called Hall at the number ending in "9712" and executed a controlled buy.   The officers then obtained another search warrant for Hall's residence and again recovered drugs, drug paraphernalia, and cash.   Hall, once more, was not present during the search, and the record does not indicate that he was contemporaneously arrested.

In February 2019, officers were surveilling Hall when he conducted a drug transaction in a parked vehicle. As Hall began to drive away, the officers pulled him over, searched the vehicle, and arrested him. He was released from custody with an ankle monitor to track his location.

The Cleveland police received information that Hall was continuing to sell drugs after his release from jail. In March 2019, they conducted still another controlled buy. The officers obtained and executed a third search warrant on Hall's residence later that month. They recovered drugs, cash, and a cell phone during the search. Hall was arrested following this third search of his residence.

After Hall's arrest, officers monitored his telephone calls from the jail where he was incarcerated. Smith was one of the officers who listened in. The officers paid particular attention to a series of calls between Hall and a person with a phone number ending in "7941" who went by the moniker "Cousin D." Based on their investigation, the officers believed that Hall was working with Cousin D to continue Hall's drug-trafficking business while Hall was incarcerated. The two men discussed the details of paying Hall's phone bill and further discussed the names and numbers of individuals with whom Hall had done business. Hall also urged Cousin D to "get that s**t out" and not "let it just go down the drain." When Cousin D prompted Hall for a location of "it," Hall said that he did not want to provide the location on the jail's phone line.

The officers investigated Hall's connection to Cousin D and the "7941" number. On April 30, 2019, Smith arranged for a CI to make a controlled buy using Hall's phone number ending in "9712." Smith monitored the CI's call. The voice Smith heard answer the phone sounded like that of Cousin D. Smith had heard Cousin D's voice multiple times while listening in on Hall's previous jail calls. Cousin D said that he would be in a green truck for the purchase.

After the call, Smith and the CI went to the agreed-upon location to execute the controlled buy. After spotting the green truck, the CI approached the passenger side, stood at the truck for a short period of time, and returned to Smith's car without speaking to anyone else. When the CI returned to the car, he handed Smith the drugs purchased during the buy. The CI

said that he had dealt with only the driver of the vehicle, not the passenger who was also in the truck. The driver had sold the CI crack cocaine and heroin for $60.

After the controlled buy, Smith dropped the CI off at a secure location while the remaining members of Smith's unit surveilled the green truck. When the truck began to drive away, takedown units stopped the vehicle. Smith's team had surveilled the truck from the moment of the buy until the moment of the stop. No one came into or out of the truck during that time.

Detective William Mazur approached the truck after the takedown units had stopped it. He detected a strong smell of marijuana coming from the vehicle. According to Mazur, Franklin confirmed that there was marijuana inside.

Mazur began to search the driver's side of the truck for evidence when he noticed that the center console "had been manipulated to the point where it was loose [such that he] could see through it." When Mazur looked behind the console, he saw some kind of knit cloth. Mazur believed that this "knitting" did not belong behind the console based on his previous experience searching vehicles. Before examining the knitting more closely, Mazur found a burnt marijuana cigar. Another officer found a white substance that he thought was crack cocaine. Even after removing these items, the smell of marijuana persisted.

Mazur believed that there were additional drugs in the truck due to the persistent smell of marijuana, so he continued the search. He searched behind the console where he had seen the knit cloth. Mazur found large quantities of drugs as well as the knit cloth, which, he realized, was actually a hat containing a scale. In total, the officers recovered from the vehicle roughly 500 grams of cocaine, 300 grams of heroin, a loaded gun, marijuana, and the substance that the officers thought was crack cocaine.

The officers identified the owner and driver of the vehicle as Franklin. They found $1,000 on Franklin's person, $60 of which was the prerecorded money from that day's controlled buy. The officers also recovered two cell phones from Franklin. One was the "9712" phone number that all of the CIs had used to schedule the controlled buys, which is generally referred to as Hall's "customer phone." The other was the "7941" phone number that Hall had regular

contact with from jail, which is generally referred to as "Cousin D's phone."  Franklin and the vehicle's passenger, Luther O'Neal, were both arrested following the April 30, 2019 stop.

**B.     Procedural background**

### 1. Pretrial proceedings

In August 2019, a federal grand jury charged Hall and Franklin in an eleven-count superseding indictment for various drug crimes.  Because only Franklin challenges the sufficiency of the evidence, we identify here those charges particularly relevant to him.  Count 1 charged both Hall and Franklin with engaging in a conspiracy to distribute controlled substances from February 2019 through April 2019, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A), and (b)(1)(B); Count 8 charged Franklin with possession with the intent to distribute controlled substances on April 30, 2019, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A); Count 9 charged Franklin with possession with the intent to distribute cocaine on April 30, 2019, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B); Count 10 charged Franklin with being a felon in possession of a firearm and ammunition on April 30, 2019, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and Count 11 charged Franklin with possession of a firearm in furtherance of a drug-trafficking crime on April 30, 2019, in violation of 18 U.S.C. § 924(c)(1)(A).

On March 2, 2020, in anticipation of trial, the government filed notices of expert testimony by Detectives Salupo and Smith.  Both notices outlined the officers' qualifications to serve as experts based on their years of experience, and further stated that the officers would testify regarding "the importance of a 'customer phone'" and the "slang or code [dealers use] when communicating about narcotics matters."  The notices also stated that the officers would testify as fact witnesses based on their participation in the investigation.

Franklin filed a motion to suppress the statements and the contraband obtained during the April 30, 2019 search of his vehicle, and the government filed a response in opposition.  The court addressed Franklin's motion to suppress and held oral argument immediately before trial on March 3, 2020.

Detective Mazur testified during the suppression hearing.  He explained that he has been an officer for 21 years, regularly investigated drug-trafficking offenses, and had conducted over 1,000 traffic stops in cases of suspected drug trafficking.  Mazur said that some of those stops involved drugs "concealed in hidden compartments," including some manipulated compartments.  He also testified that he has smelled marijuana many times and has searched vehicles for marijuana more than 100 times.

Mazur also related his involvement in the investigation of Hall and Franklin, which led to the search of Franklin's truck.  He then testified about the search itself, which yielded a marijuana cigar, a bag of marijuana, and what appeared to be a rock of crack cocaine in the manner described above.  Mazur then performed an "inventory search" after completing his search for the source of the marijuana smell.

The suppression-hearing testimony established that Franklin owned and operated the searched vehicle.  Mazur also discussed his inventory list, which he had filled out pursuant to Cleveland Police Department procedure.  The inventory list showed Franklin as the legal owner of the searched vehicle.  Mazur further testified that Franklin was driving the vehicle when it was stopped for the search on April 30, 2019.

The court denied Franklin's motion to suppress, holding as follows:

> It's pretty clear here that the officer had probable cause to stop the vehicle, probable cause to arrest Mr. Franklin and Mr. O'Neal, and at the time, the evidence, at least that Detective Mazur had in his head, was that the vehicle was used in a drug transaction, it was used as a criminal tool in a drug transaction.  So, clearly, the vehicle was properly seized and being properly seized, is subject to search, and so, the officer's search, even—was more emphasized by the fact of his experience and what he heard and what he saw and what he smelled with the blunt and that he thought there was more marijuana in the car and looked for that and saw the console that was loose and saw a knit—something knit in there.  And in his experience, he said that that was more drugs, that coupled with the fact that there was a prior sale that was related to him that involved heroin and/or fentanyl, a dangerous substance, he couldn't leave the car alone or let it go without searching for that as well.  So during the inventory of the car, if you want to characterize it as an inventory, they had the right to go and look in different areas of the vehicle, even if it's a locked area of the vehicle, for the inventory search, so for all those reasons, and the reasons stated in the Government's response, the motion is denied.

### 2. *Jury selection*

Jury selection commenced after the district court denied Franklin's suppression motion. During jury selection, Hall's lawyer asked the panel whether any of them had "ever been accused or had family members accused of a crime." Juror Number 7 said that she had had multiple family members who were "accused of offenses" and were "victims of offenses." She explained that she had "been thinking about this and I'm really not sure that I can be impartial here." The government then excused Juror Number 7, using one of its peremptory strikes. Juror Number 7 was a Black woman.

At the conclusion of jury selection, Hall's counsel argued that the strike constituted a violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Hall's counsel sought to have the government provide a "racially neutral excuse[]" for the strike, arguing that "one challenge of a minority is adequate to challenge the peremptory use by the Government." The district court responded before the government could provide an explanation, stating that "there has to be some basis for that motion, not just because a person . . . happens to be a minority." It determined that there was no basis for the argument because "the Government excused three jurors, two of whom were Caucasians, one was a minority." The court also noted that Hall had excused four white jurors, Franklin had excused four white jurors, and that there were at least two minority jurors remaining in the final 12.

Although the district court did not seek a response, the government offered one for the record. The government explained that Juror Number 7's connection to "the system" raised a concern as to whether "she could be fair." In further response, the government noted that it had excused white Juror Number 4, "who had the same issue." During this exchange, the government commented that Juror Number 7 was wearing "a very interesting outfit."

### 3. *Trial*

The government introduced evidence establishing a relationship between Hall and Franklin through Detective Smith's testimony. It established Smith as an expert in narcotics based on his extensive experience in the vice unit. Smith explained that he has participated in "[w]ell over a thousand" drug investigations during his time with the vice unit, conducted

"[o]ver a thousand" controlled buys, and interviewed "well over a thousand" drug users or traffickers. He also explained that he is familiar with the slang or code words used in the drug trade and with drug dealers' tendency to use multiple phones to conduct their business. Smith further said that he has listened to numerous jail calls during drug-trade investigations.

The government then introduced recorded jail calls that Hall had placed to Cousin D using a phone number ending in "7941." It established that officers recovered a phone with that number from Franklin when they arrested him on April 30, 2019. The government played clips of these calls for the jury, and Smith interpreted them. Smith's interpretation of these calls established that Franklin—using the name Cousin D—had communicated with Hall and enabled Hall to carry on his drug trade while incarcerated.

Text messages between Hall and the phone number ending in "7941" were also introduced, which further corroborated this relationship. These texts and Smith's interpretations of them established that customers bought heroin and cocaine from Franklin, and that Franklin communicated with Hall about these transactions.

Smith's testimony further corroborated the relationship between Hall and Franklin because he established that Franklin had Hall's "9712 customer phone" and Cousin D's "7941" phone on his person when the police arrested Franklin on April 30, 2019. When Smith used Hall's customer phone (ending in 9712) to call Cousin D's phone (ending in 7941), he said that the two phones connected.

The government also introduced evidence to support the charges of possession with the intent to distribute controlled substances (Counts 8 and 9) and the felon-in-possession-of-a-firearm charges (Counts 10 and 11). Smith testified to the particulars of the April 30, 2019 controlled buy and established that the CI purchased $60 of cocaine and heroin from the driver of a green truck. When the vehicle was searched, the officers recovered the loaded gun, cocaine, and heroin in addition to other contraband. Detective Salupo testified that "drug dealers" often carry guns "[f]or protection."

The jury returned its verdict on March 9, 2020. Hall was found guilty on Count 1 and on four other counts. Franklin was found guilty on Counts 1, 8, 9, 10, and 11.

Nos. 20-4128/4144 *United States v. Hall, et al.* Page 9

#### *4. Sentencing*

The district court sentenced both Hall and Franklin to a period of 360 months of incarceration. Because only Hall challenges the court's sentencing decision, we will examine the sentence solely as it relates to Hall.

The district court heard Hall's arguments concerning the circumstances of his youth, including his time in the foster-care system and the lack of a positive male role model in his life. It also reviewed Hall's sentencing memorandum, which outlined his physical and mental-health issues.

In rendering its decision, the district court noted that Hall's "criminal history span[ned] seven pages with two juvenile adjudications, including a first degree felony for aggravated burglary, and 22 adult criminal convictions," despite Hall's relatively young age of 40. The court further commented that Hall's lengthy criminal history put his score "off the charts, amassing 17 criminal history points from 2008 to 2015 and another three points from 2003 for [his] conviction for aggravated burglary, which was a first degree felony, with a firearm specification." This history, according to the court, showed that Hall "had scant time as an adult in which [he] w[as] free and not pending new charges."

The district court concluded that Hall's total offense level was 37, his criminal history category was VI, and his Guidelines range was 360 months to life in prison. It sentenced Hall to 360 months of incarceration, which was at the bottom of his Guidelines range.

Hall did not object to his sentence at the sentencing hearing, nor did he object to the Presentence Report. He objected only to the admission of exhibits showing that Hall had committed certain criminal acts while he was detained in jail.

## II. ANALYSIS

### A.     The district court did not err in denying Hall's *Batson* challenge

Hall's first issue on appeal is his contention that the district court erred in rejecting his *Batson* challenge to the government's peremptory strike of Juror Number 7, who was Black. "We review a district court's determination of a *Batson* challenge with great deference" under

the clear-error standard. *United States v. Cecil*, 615 F.3d 678, 685 (6th Cir. 2010) (citation and internal quotation marks omitted).

The district court properly ruled that Hall did not make out a prima facie case to establish a *Batson* claim. Hall argued that merely using one peremptory strike on a Black juror is sufficient to establish a prima facie case. That is not the law. *See United States v. Mahbub*, 818 F.3d 213, 224 (6th Cir. 2016) (listing the elements of a *Batson* claim). Any error, moreover, was harmless because the government established a facially valid, race-neutral reason for the peremptory strike of Juror Number 7.

Under the Fourteenth Amendment's Equal Protection Clause, a party cannot use peremptory challenges to exclude members from a jury "solely on account of their race." *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). A violation of this tenet is known as a *Batson* violation. To establish a *Batson* violation, "the complaining party must first make a prima facie showing that the peremptory challenge was based on race." *Cecil*, 615 F.3d at 686 (alterations and citation omitted). The complainant establishes a prima facie case by showing "each of the following elements": (1) the defendant is "a member of a cognizable racial group," (2) the striking party used a peremptory challenge against someone of the same race as the defendant, and (3) "these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the potential jurors from the petit jury on account of their race." *Mahbub*, 818 F.3d at 224 (alterations omitted).

In the instant case, Hall established the first two elements of a prima facie case for a *Batson* violation—(1) that Hall is "a member of a cognizable racial group," and (2) that the government used a peremptory challenge against someone of the same race as him—but failed to establish "any other relevant circumstances [that] raise an inference that the prosecutor used that practice to exclude the potential juror[] from the petit jury on account of [her] race." *Id.* Excluding one Black juror without any additional allegations of discriminatory intent does not amount to a prima facie *Batson* claim. *Id.*

The district court rejected the *Batson* claim based on the totality of the circumstances.  It noted that the government "excused three jurors, two of whom were Caucasians, one [of whom] was a minority," and, of the remaining 12 jurors, there were "at least two minority jurors."

And even if Hall had made out a prima facie *Batson* claim, the government offered "a facially valid, race-neutral explanation for the challenge."  *See Cecil*, 615 F.3d at 686 (citation omitted).  The government explained that Juror Number 7 had "friends or family who had encounters with the law," and that those circumstances were a cause of concern for the government.  It also explained that it had struck a white juror for the same reason.  During this explanation, the government commented that Juror Number 7 was wearing "a very interesting outfit" without elaborating.  This unexplained remark is puzzling, but is not enough to demonstrate that the prosecutor struck the juror on account of her race.  Based on an assessment of "the proponent's credibility under all of the pertinent circumstances, and . . . the asserted justification against the strength of the opponent's prima face case under the totality of the circumstances," *id*. (alterations and citation omitted), Hall has no viable *Batson* claim.

**B.      The district court did not commit plain error in sentencing Hall to a period of incarceration of 360 months**

Hall's remaining claim is that the district court abused its discretion in sentencing him to 360 months of incarceration because the court failed to consider his lack of a positive male role model, his mental-health issues, and his other history and characteristics.  At sentencing, "as at every other phase of a criminal proceeding, each party has a duty to object to rulings by a court in order to preserve them for appeal."  *United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008).  If a defendant fails to make an objection "after being given 'an opportunity' to do so, [he] forfeits the argument and may obtain relief on appeal only if the error is 'plain' and 'affects substantial rights.'"  *Id.* (quoting Fed. R. Crim. P. 52(b)).

Hall failed to object to his sentence at the sentencing hearing when the district court asked if he had any objections.  The plain-error standard therefore applies.  *See United States v. Bostic*, 371 F.3d 865, 872–73 (6th Cir. 2004) ("If a party does not clearly articulate any objection" when the district court inquires about objections after pronouncing the sentence but

before adjourning the hearing, "the party will have forfeited its opportunity to make any objections not previously raised and thus will face plain error review on appeal.")

We review sentencing decisions "for both procedural and substantive reasonableness." *United States v. Morgan*, 687 F.3d 688, 693 (6th Cir. 2012). Procedural reasonableness mandates that a court "properly calculate the guidelines range, treat the guidelines as advisory, consider the § 3553(a) factors and adequately explain the chosen sentence—including an explanation for any variance from the guidelines range." *Id.* (quoting *United States v. Presley*, 547 F.3d 625, 629 (6th Cir. 2008)). It further mandates that the court's sentence "be based on a reasonable determination of the facts." *Id.* If we conclude that the district court made no significant procedural errors, we "then consider the substantive reasonableness of the sentence . . . , tak[ing] into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007). "[A] presumption of reasonableness" may be applied if the sentence is within the Guidelines range. *Id.*

The district court's decision to sentence Hall to 360 months of incarceration was neither procedurally nor substantively unreasonable. Although the court did not mention "all of the statutory factors or the guidelines explicitly, and although explicit mention of those factors may facilitate review, this court has never required the 'ritual incantation' of the factors to affirm a sentence." *United States v. Johnson*, 403 F.3d 813, 816 (6th Cir. 2005) (citation omitted).

Hall claims that the district court did not "consider the probation officer's suggestion of [Hall's] lack of a positive male role model, mental health issues, and characteristics as grounds for a downward variance," but the court explained on the record that it reviewed the government's Presentence Report and Hall's sentencing memorandum, both of which addressed those issues. The court also heard Hall's arguments concerning the circumstances of his youth, including his time in the foster-care system and the lack of a positive male role model in his life.

In the end, the district court determined that Hall's "off the charts" criminal history outweighed these mitigating factors. It sentenced Hall to his Guidelines minimum of 360 months of imprisonment. This decision is presumed reasonable because it was within the

Guidelines range, and Hall has failed to successfully rebut that presumption. Hall's sentence was therefore procedurally and substantively sound and did not constitute plain error.

**C.      The district court did not clearly err in denying Franklin's motion to suppress**

We now address the issues raised by Franklin. Franklin argues that the district court abused its discretion in denying his motion to suppress statements made and contraband seized during the April 30, 2019 search of his vehicle because the officers allegedly lacked probable cause for the search. A district court's decision to deny a motion to suppress is reviewed under the clear-error standard for the factual findings and de novo for legal determinations. *United States v. Dunning*, 857 F.3d 342, 346 (6th Cir. 2017). We can "uphold the denial of the motion to suppress on any ground supported by the record," regardless of whether the district court directly addressed that ground. *United States v. Galaviz*, 645 F.3d 347, 354 (6th Cir. 2011) (upholding the district court's decision to deny a motion to suppress on plain-view grounds even though the court did not address the plain-view exception).

Obtaining a search warrant for an automobile presents unique circumstances given that a "vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Carroll v. United States*, 267 U.S. 132, 153 (1925). Given these unique circumstances, "a warrantless search of an automobile, based upon probable cause to believe that the vehicle contained evidence of crime," does not violate the Fourth Amendment's warrant requirement. *California v. Acevedo*, 500 U.S. 565, 569 (1991). This includes the right "to search every part of the vehicle and all containers found therein in which the object of the search could be hidden." *United States v. Stubblefield*, 682 F.3d 502, 507 (6th Cir. 2012).

The officers here had probable cause to search the vehicle that Franklin was driving on April 30, 2019. Initially, this probable cause derived from the controlled buy; later, this probable cause derived from the potent and persistent smell of marijuana in the vehicle. These circumstances gave the officers probable cause to search any place where drugs could be hidden. *See United States v. Brooks*, 987 F.3d 593, 599 (6th Cir. 2021) (noting that "our court has long held that officers have the required probable cause when they detect the odor of illegal marijuana coming from the vehicle" and that such a smell permits a warrantless search of the vehicle).

Ultimately, the officers found additional drugs behind the manipulated center console of Franklin's truck.

The district court found that Detective Mazur had probable cause to continue to search the vehicle based on the totality of the circumstances. Those circumstances included the fact that, "in [Mazur's] experience," he believed "there was [sic] more drugs." Although the court did not explicitly mention the automobile exception, the court determined that there was probable cause for the search based on the belief that there were additional drugs in the vehicle. Regardless of whether the court rendered its decision on automobile-exception grounds, the automobile exception applies. Based on this analysis, the district court did not commit clear error in denying Franklin's suppression motion.

**D.     The district court did not plainly err in admitting Detective Smith's opinion testimony**

We next consider Franklin's four objections to Smith's testimony. Franklin appeals on the grounds that (1) he did not receive notice of Smith's testimony; (2) Smith's testimony exceeded the bounds of his expertise without laying the proper foundation; (3) the government failed to delineate between Smith's expert and lay-opinion testimony; and (4) Smith testified to the ultimate issue in the case, in violation of Rule 704 of the Federal Rules of Evidence. Franklin did not object to Smith's opinion testimony at trial. He objected only to Smith's identification of Franklin's voice. This objection applies to a different issue, which we discuss separately below. Evidentiary rulings, like the admission of Smith's testimony, are reviewed under the plain-error standard if a defendant fails to object at trial. *See United States v. Young*, 847 F.3d 328, 349 (6th Cir. 2017).

### *1.      The government provided notice of Smith's testimony*

Franklin argues that he was not put on notice of Smith's testimony. The record does not support Franklin's argument. Pursuant to Rule 702, the government notified the defense that Smith would testify as both an expert and a fact witness in its notice of expert testimony.

**2.     The government laid the requisite foundation for Smith's testimony, and the testimony did not exceed the scope of Smith's expertise**

Franklin argues that Smith's testimony interpreting Hall's and Franklin's calls and texts exceeded the bounds of his expertise and was not proper lay-opinion testimony. Although Smith toggled between offering expert and lay-opinion testimony in his interpretations, the district court did not commit plain error in permitting Smith's testimony because Smith had personal knowledge of the investigation and the calls contained enough street language that Smith's interpretation of them was helpful to the jury. *See Young*, 847 F.3d at 351 (holding that the district court did not err in admitting an officer's testimony when calls contained slang and jargon requiring interpretation).

**a.     The government laid a sufficient foundation for Smith's expert and lay-opinion testimony**

Courts often permit officers to testify as expert witnesses under Rule 702 of the Federal Rules of Evidence to interpret conversations concerning drug trafficking that use "slang, street language, and the jargon of the illegal drug trade." *Id.* at 350 (internal quotation marks omitted); *United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015) ("Courts often qualify law enforcement officers as *expert witnesses* under Rule 702 to interpret intercepted conversations that use . . . the jargon of the illegal drug trade." (emphasis in original) (internal quotation marks omitted)). Under Rule 702,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

A different standard applies if an officer testifies as a lay witness under Rule 701 of the Federal Rules of Evidence. Rule 701 requires that a lay witness's opinion testimony be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Given these requirements, an officer's lay opinion is admissible only when he "is a participant in the conversation, has personal knowledge of the facts being related in the conversation, or observed the conversations as they occurred." *Kilpatrick*, 798 F.3d at 379 (quoting *United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001)).

The government laid a sufficient foundation to establish Smith's expertise. Smith testified that he had worked at the Cleveland Police Department for 21 years total, including 10 years as a detective in the vice unit. He explained that he has participated in a vast number of drug investigations, controlled buys, and interviews with drug users or traffickers. Smith also said that he is familiar with slang or code words used in the drug trade and with drug dealers' tendency to use multiple phones to conduct a drug trade. He further testified that he has listened to jail calls during drug-trade investigations. Based on this testimony, the government clearly established that Smith had the "knowledge, skill, experience, training, or education" necessary to give his expert opinion on matters concerning drug trafficking. *See* Fed. R. Evid. 702.

The government also laid the proper foundation for Smith to testify under Rule 701. Rule 701(a) requires that a witness's lay opinion be "rationally based on the witness's perception." Fed. R. Evid. 701(a). This requirement "is the familiar requirement of first-hand knowledge or observation." Fed. R. Evid. 701 Advisory Comm. Notes. Smith testified that he was directly and extensively involved in the investigation of Hall and Franklin. Detective Salupo acknowledged that the investigation into Franklin, specifically, "was ultimately Detective Smith's investigation." Smith was present for the execution of the three search warrants at Hall's residence between October 2018 and March 2019. Hall's jail calls with Cousin D were also monitored by Smith. Smith recognized Cousin D's voice as that of Franklin after Franklin's arrest on April 30, 2019, he was personally present when Franklin was arrested on that date, and he set up the controlled buy that led to Franklin's arrest.

> **b.**     ***The district court did not plainly err in admitting Smith's opinion testimony regarding Hall's and Franklin's calls and texts***

Smith's expert-opinion testimony did not exceed the bounds of his expertise. Any lay opinions that Smith offered while interpreting the calls and texts were based on his personal knowledge. The calls and texts involved enough street language to render Smith's opinion testimony helpful to the jury.

A comparison between two Sixth Circuit cases on the issue of expert and lay-opinion testimony is instructive in resolving this matter. In *United States v. Freeman*, 730 F.3d 590 (6th Cir. 2013), this court defined the boundaries of officers' opinion testimony that interprets intercepted conversations based on their familiarity with the investigation. The government conceded that certain portions of an FBI agent's interpretations of wiretapped phone calls were "not expert testimony," but were, instead, "based upon [the agent's] personal knowledge." *Id.* at 594–95. It specifically offered this testimony under Rule 701. *Id.* The FBI agent's testimony was held to have violated Rule 701(a)'s requirement that testimony rely on a witness's rationally based perception when he "repeatedly substantiated his responses and inferences with generic information and references to the investigation as a whole." *Id.* at 596. Because the agent failed to specify the sources of his information, this court was left to infer that "he was expressing an opinion informed by all the evidence gleaned by various agents in the course of the investigation and not limiting himself to his own personal perceptions." *Id.* (quoting *United States v. Garcia*, 413 F.3d 201, 213 (2d Cir. 2005)). The agent's testimony violated Rule 701(b)'s helpfulness requirement because opinion testimony is not helpful when it concerns "matters that were equally within the competence of the jurors to understand and decide" on their own. *Id.* at 597 (quoting *McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1272 (6th Cir. 1988)). Given that the agent's testimony "consisted of many opinions and conclusions [that] the jury was well equipped to draw on their own," and "interpret[ed] even ordinary English language," his opinions were held to not be helpful to the jury. *Id.*

In *United States v. Young*, 847 F.3d 328 (6th Cir. 2017), on the other hand, this court distinguished *Freeman*. The defendants in *Young* objected only to the agent's testimony that the word "quarter" could refer to a certain quantity of crack cocaine. *Id.* at 350. Therefore, the court

"review[ed] for plain error most of [the defendants'] challenges to the agent's testimony." *Id.* at 351. The court held that the district court did not commit plain error in admitting all of the agent's testimony because the calls included "enough slang and jargon" that the agent's testimony "was necessary and [would] be helpful to the jury." *Id.*

Franklin compares his case to *Freeman*, but it is more akin to *Young* in three ways. First, like the defendants in *Young*, Franklin failed to object to the bulk of Smith's testimony. Franklin, in fact, did not object to any of Smith's interpretations of the phone calls. In *Freeman*, defense counsel objected near the beginning of the FBI agent's testimony on the ground that the agent's interpretation of the phone calls went beyond his expertise. 730 F.3d at 594. The government responded that the interpretations of the phone calls were not expert testimony, but were, instead, "based upon [the agent's] personal knowledge of the investigation." *Id.* at 595. In overruling the objection, the district court granted the defense "a standing objection to all of [the agent's] lay interpretations regarding the phone calls." *Id.* Because defense counsel objected, this court reviewed the district court's judgment under the abuse-of-discretion standard. *Id.*

Here, in contrast, we review the admission of Smith's interpretations under the plain-error standard, as the court did in *Young*, because of Franklin's failure to object. Second, as explained above, Smith was very familiar with the investigation. Smith, like the agent in *Young* and unlike the agent in *Freeman*, established personal knowledge for his lay-opinion testimony and did not summarily cite to the broader investigation as his source of information. Third, like the content of the calls in *Young*, most of the calls at issue in Smith's testimony involved "enough slang and jargon" such that Smith's testimony concerning what Hall and Franklin were discussing would "be helpful to the jury." *See Young*, 847 F.3d at 351. The district court therefore did not commit plain error in admitting the testimony.

### 3. *Smith did not need to clearly delineate between expert and fact testimony*

Franklin next argues that when an officer testifies as both an expert and a fact witness, the government should procedurally separate the expert and fact-opinion testimony into different sections of the examination. This argument fails because such separation is not required.

This court has determined that "when a witness gives both fact and expert testimony, the district court must give a cautionary jury instruction regarding the witness's dual witness roles *or* there must be a clear demarcation between the witness's fact testimony and expert opinion testimony." *United States v. Ham*, 628 F.3d 801, 806 (6th Cir. 2011) (emphasis added) (internal quotation marks and alterations omitted). The district court instructed the jury that Detectives Salupo and Smith had testified as both fact and expert witnesses, so the jury should "consider the factors [the court] discussed earlier in these instructions for weighing the credibility and believability of witnesses" in analyzing the fact testimony, but the jury did "not have to accept Detective Smith's or Detective Salupo's opinions in deciding how much weight to give them" in analyzing their expert opinions. Franklin did not object to this jury instruction.

The challenged instruction is even more rigorous than some jury instructions that this court has upheld as sufficiently addressing the risk of dual-role witnesses. *See, e.g.*, *United States v. Lopez-Medina*, 461 F.3d 724, 743 (6th Cir. 2006) (affirming an instruction "where the jury was not explicitly cautioned regarding a law enforcement agent's 'dual role,' [but] the jury instructions . . . at least included an instruction on how to weigh expert opinion testimony.") Because the district court gave the instruction set forth above, it did not commit plain error in allowing Smith to oscillate between being an expert witness and a fact witness without a clear demarcation.

### 4.      *Smith did not impermissibly testify as to the ultimate issue*

Franklin further claims that Smith testified to the ultimate issue, in violation of Rule 704 of the Federal Rules of Evidence, when he opined that the quantity of narcotics found in the vehicle that Franklin was driving on April 30, 2019 constituted a drug-trafficker's amount. But Franklin failed to object to this testimony during trial, so we review the admission of this testimony under the plain-error standard. *See Young*, 847 F.3d at 349.

Rule 704 prohibits an expert from "stat[ing] an opinion about whether the defendant did or did not have a mental state . . . that constitutes an element of the crime charged." Fed. R. Evid. 704(b). This court has previously considered the issue of whether an expert's categorization of a certain amount of drugs as a distribution or trafficker's amount violates Rule

704. In *United States v. Ham*, 628 F.3d 801 (6th Cir. 2011), the defendant argued that the district court erred by allowing an agent to testify whether certain quantities of crack were consistent with personal use. *Id.* at 805. The court emphasized that "this Court routinely allows qualified law enforcement officials to testify that circumstances are consistent with drug distribution rather than personal use." *Id.* (quoting *United States v. Alford*, 332 F. App'x 275, 282 (6th Cir. 2009)).

Neither the government's question nor Smith's response explicitly referenced Franklin's intent. Rather, after establishing that 500 grams of cocaine and 300 grams of heroin constitutes a drug-trafficker's amount, Smith defined the term "distribution amount" as "someone that's trying to get rid of a lot of dope, it's not just a guy selling just an ounce and two ounces in the house and breaking it down to 10s, 20s." Given that this court has reiterated that an officer is permitted to testify that certain quantities of narcotics are consistent with drug distribution rather than personal use, the district court did not plainly err in permitting Smith to testify that 500 grams of cocaine and 300 grams of heroin constitute a drug-trafficker's amount.

**E.** **The district court did not abuse its discretion in permitting Smith to identify the voice of Cousin D and permitting Detective Salupo to identify Franklin as Cousin D in court**

The identification of Cousin D is the next issue raised by Franklin. We review the district court's decision to admit evidence to which the defendant timely objected at trial under the abuse-of-discretion standard. *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir., 2015). A court abuses its discretion when "it relies on clearly erroneous findings of fact, improperly applies the law, or employs an erroneous legal standard, or when [the reviewing court is] firmly convinced that the trial court committed a clear error of judgment." *Id.* (internal quotation marks omitted). We must "view the evidence in the light most favorable to the government by maximizing the probative value of the evidence and minimizing its potential prejudice." *United States v. Young*, 847 F.3d 328, 349 (6th Cir. 2017) (citation omitted). Franklin timely objected to Smith's testimony identifying Cousin D's voice as that of Franklin, so we review the court's decision to admit the testimony under the abuse-of-discretion standard. But Franklin failed to object to Salupo's testimony in court identifying Franklin as Cousin D, so we review the court's decision to admit that testimony under the plain-error standard.

> ### *1.      The district court did not err in permitting Smith to identify Cousin D's voice as that of Franklin*

Under Rule 901 of the Federal Rules of Evidence, the authentication of evidence is "a condition precedent to admissibility." *United States v. Fults*, 639 F. App'x 366, 373 (6th Cir. 2016) (quoting *United States v. Jones*, 107 F.3d 1147, 1150 (6th Cir. 1997)). That authentication is satisfied by "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). This requirement "does not erect a particularly high hurdle" for a proponent to clear. *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001) (quoting *United States v. Ortiz*, 966 F.2d 707, 716 (1st Cir. 1992)).

As it relates to opinions about voice identification, Rule 901 specifically provides that "[a]n opinion identifying a person's voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker" satisfies Rule 901(a)'s requirement. Fed. R. Evid. 901(b)(5). To admit "an opinion as to the identity of a speaker," the offering party simply needs to show "that the identifier has heard the voice of the alleged speaker at any time." *United States v. Cooke*, 795 F.2d 527, 530 (6th Cir. 1986) (quoting *United States v. Rizzo*, 492 F.2d 443, 448 (2d Cir. 1974)). The identification might be "doubtful, but this doubt merely goes to the weight to be given to the [identifier's] testimony, not to the admissibility of the recordings" if the identifier has at least "minimal exposure" to the voice. *Rizzo*, 492 F.2d at 448.

Smith was familiar with Franklin's voice from his time listening to jail calls from Hall to Cousin D throughout the course of his investigation. Smith testified that the voice he heard answering the customer phone preceding the April 30, 2019 controlled buy sounded the same as the voice of Cousin D from Hall's jail calls. These circumstances comport with the example of proper voice identification provided in Rule 901(b)(5), which states that an identifier needs only to have "hear[d] the voice at any time under circumstances that connect it with the alleged speaker." Because the circumstances surrounding the identification meet the Rule 901 requirement, the district court did not abuse its discretion in admitting Smith's identification of Franklin's voice.

### 2.      *The district court did not commit plain error when it allowed Salupo to identify Franklin as Cousin D*

Franklin next argues that the district court erred in allowing Salupo to identify Franklin as Cousin D without laying the proper foundation.  But, as previously noted, Franklin failed to object to this testimony at trial.  Salupo, moreover, did not identify Franklin's voice.  He instead testified that he "learn[ed] the identity of the person known as Cousin D to be . . . Gregory D. Franklin" through his investigation.

Salupo testified at length about his involvement in the drug investigation.  From the jail calls, Salupo learned that Hall "was in contact with somebody on the outside . . . named Cousin D."  He learned that Hall "was still directing the drug operation" through his jail calls.  Salupo was involved in the investigation from the first search of Hall's residence in October 2018.  As a part of the investigation team, Salupo learned that "[t]here was a customer number that people . . . called" with "a number that could be passed on" among people who wanted to keep the drug-selling business alive.

Salupo said that this customer number ensured that a group of dealers could maintain their business because "[i]n case [a customer] lose[s] one drug dealer, [he is] still able to call the same number to another drug dealer to still . . . buy more drugs."  He testified that once the team learned that Cousin D controlled the phone in question, Salupo helped to "set up a controlled buy" with Cousin D.  Salupo was personally present when Franklin was arrested after that controlled buy.  Based on this foundation, the district court did not plainly err in admitting Salupo's identification of Franklin as Cousin D.

## F.      The evidence was sufficient to convict Franklin on Counts 1, 8, 9, 10, and 11 of the indictment

Franklin's final challenge is to the sufficiency of the evidence presented to convict him on Counts 1, 8, 9, 10, and 11.  A defendant challenging the sufficiency of the evidence "must surmount a demanding legal standard."  *United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019).  We review de novo a district court's decision to deny a motion to acquit based upon a claim of insufficient evidence.  *United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016).  Franklin moved for acquittal at the conclusion of the government's case-in-chief.

In reviewing the record, the district court "gives the prosecution the benefit of all reasonable inferences from the testimony." *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006). We look to assess "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In making this assessment, we do "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

### 1.     *The government presented sufficient evidence to sustain Franklin's conviction on Count 1*

Count 1 charged Hall and Franklin with engaging in a conspiracy to distribute controlled substances from February 2019 through April 2019, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A), and (b)(1)(B). To convict a defendant of "a conspiracy under [21 U.S.C.] § 846, the government must prove, beyond a reasonable doubt, (1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy." *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999) (internal quotation marks omitted). The government must show that the defendant "was aware of the object of the conspiracy and that he voluntarily associated himself with it to further its objectives." *Id.* at 421 (quoting *United States v. Hodges*, 935 F.2d 766, 772 (6th Cir. 1991)). As for the defendant, he does not need to "be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement." *Id.* (quoting *Hodges*, 935 F.2d at 773).

The government introduced sufficient evidence to establish that a conspiracy to distribute drugs existed between Hall and Franklin in 2019. Smith testified that Franklin was arrested after he sold $60 worth of narcotics to a CI. Officers recovered a "trafficker's amount" of drugs from the vehicle that Franklin was in on April 30, 2019. Smith testified that Franklin had both Hall's customer phone and Cousin D's phone on his person when Franklin was arrested on that date. Moreover, the recorded jail calls, as interpreted by Smith, established that Cousin D had had numerous conversations with Hall over the preceding months concerning Hall's drug-trafficking business. Cousin D turned Hall's customer line back on, and Hall provided Cousin D with the

names of customers to contact. All of the above constitutes sufficient evidence to prove a conspiracy under Count 1.

### 2. *The government presented sufficient evidence to sustain the possession charges: Counts 8, 9, 10, and 11*

This leaves the remaining counts that Franklin challenges. Count 8 charged Franklin with possession with intent to distribute controlled substances on April 30, 2019, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A); Count 9 charged him with possession with intent to distribute cocaine on April 30, 2019, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B).

To convict a defendant of possession with the intent to distribute, the government must show "(a) the defendant knowingly (b) possessed a controlled substance (c) with the intent to distribute." *United States v. King*, 339 F. App'x 604, 608 (6th Cir. 2009) (citing 21 U.S.C. § 841(a)(1), (b)(1)(B)). The defendant does not need to be in actual possession of the substances; "constructive" or "joint" possession suffices. *United States v. Paige*, 470 F.3d 603, 609 (6th Cir. 2006). The evidence demonstrates constructive possession when it shows "ownership, dominion, or control over the contraband itself or the premises or vehicle in which the contraband is concealed." *United States v. White*, 932 F.2d 588, 589 (6th Cir. 1991) (quoting *United States v. Gordon*, 700 F.2d 215, 217 (5th Cir. 1983)). Drug possession may be proven either by direct or circumstantial evidence, and such evidence need not "remove every reasonable hypothesis except that of guilt." *United States v. Morgan*, 469 F.2d 83, 83 (6th Cir. 1972) (quoting *United States v. Prieur*, 429 F.2d 1237, 1238 (6th Cir. 1970)). Intent to distribute may be inferred from a large quantity of drugs. *United States v. Phibbs*, 999 F.2d 1053, 1065–66 (6th Cir. 1993) (finding that the possession of one kilogram of cocaine was enough to support an inference of intent to distribute).

A rational finder of fact could find that Franklin was jointly and constructively in possession of the 500 grams of cocaine and the 300 grams of heroin because he was one of the occupants of the truck in which the drugs were found on April 30, 2019. *See United States v. Cantrell*, 807 F. App'x 428, 430–33 (6th Cir. 2020) (finding sufficient evidence on the drug-possession count when the defendant was one of three people in a car that "contained a loaded gun, large quantities of drugs that indicated trafficking rather than individual use, [and] three sets

of digital scales," even though the defendant was neither the driver nor the owner of the car). Further, as explained above, Franklin had two phones on him that were being used to communicate with Hall and to execute a drug conspiracy. The evidence was therefore sufficient to convict Franklin on Counts 8 and 9.

There was also sufficient evidence to convict Franklin on Counts 10 and 11 for similar reasons. Count 10 charged Franklin with being a felon in possession of a firearm and ammunition on April 30, 2019, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). And Count 11 charged him with possession of a firearm in furtherance of a drug-trafficking crime on that date, in violation of 18 U.S.C. § 924(c)(1)(A).

To convict a defendant as a felon in possession of a firearm and ammunition, the government must prove "(1) that the defendant has a prior conviction for a crime punishable by imprisonment for a term exceeding one year; (2) that the defendant thereafter knowingly possessed the firearm and ammunition specified in the indictment; and (3) that the possession was in or affecting interstate commerce." *United States v. Schreane*, 331 F.3d 548, 560 (6th Cir. 2003) (quoting *United States v. Daniel*, 134 F.3d 1259, 1263 (1998)). "[T]he defendant's mere presence in a car with a weapon" is insufficient to establish possession, *United States v. Arnold*, 486 F.3d 177, 183 (6th Cir. 2007), but "other incriminating evidence, coupled with presence, . . . serves to tip the scales in favor of sufficiency." *Id.* (internal alterations omitted) (quoting *United States v. Birmley*, 529 F.2d 103, 108 (6th Cir. 1976)).

On appeal, Franklin does not dispute that he signed a stipulation establishing elements one and three. The only contested element is the issue of possession. Franklin contends that because "the firearm in this case was recovered from a non-readily accessible console of the vehicle occupied by two individuals," the government failed to establish possession. But this argument fails because Franklin jointly and constructively possessed the gun for the same reasons that Franklin jointly and constructively possessed the drugs. Further, Franklin had just conducted a drug deal with the CI, and Salupo testified that "drug dealers" often carry guns "[f]or protection." A rational trier of fact could therefore find that Franklin possessed the firearm and ammunition.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.