NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0099n.06

Nos. 22-5142/5162

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td><td rowspan="11"><b>FILED</b><br>Mar 06, 2024<br>KELLY L. STEPHENS, Clerk<br><br>ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY<br><br>OPINION</td></tr>
<tr><td style="padding-left:2em;">Plaintiff - Appellee,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td style="padding-left:2em;">v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>MARCUS BENNETT (22-5142); ERIC BENNETT (22-5162),</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td style="padding-left:2em;">Defendants - Appellants.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

Before: GRIFFIN, BUSH, and READLER, Circuit Judges

GRIFFIN, J., delivered the opinion of the court in which BUSH and READLER, JJ., joined. READLER, J. (pp. 18–19), delivered a separate concurring opinion, in which BUSH, J., joined.

GRIFFIN, Circuit Judge.

A confidential informant for the United States Postal Inspection Service purchased heroin from defendants Marcus and Eric Bennett during eleven controlled buys, but the CI died before their trial. The evidence admitted at trial included testimony from a postal inspector about statements the deceased CI made to law enforcement, as well as the inspector's interpretations of communications between defendants and the CI. A jury ultimately convicted Marcus and Eric of conspiracy to distribute heroin and Eric of related firearms offenses. On appeal, defendants raise issues concerning the admission of the CI's statements and the inspector's testimony, as well as the district court's sentencing determinations. We affirm.

I.

The Postal Inspection Service began investigating brothers Marcus and Eric Bennett following the non-fatal shooting of postal carrier Da'Ron Lester. Lester believed that Eric shot him at Marcus's direction—apparently Marcus was supposed to receive a package of narcotics in the mail and suspected that Lester kept the package.

Postal Inspector Aaron Mehall led the investigation into the Bennetts. Investigators tapped and tracked Marcus's phone, which revealed several calls to the USPS help line for tracking parcels. Those parcels came from known drug-source states, contained fictitious return addresses, and carried large sums of money. Phone calls also revealed that Marcus was in contact with known narcotics traffickers.

Though the investigation into the Bennetts initially focused on Lester's shooting, it morphed into a narcotics-trafficking investigation after Quanta Malone offered to become a CI and purchase heroin from defendants. Malone ultimately helped law enforcement conduct eleven controlled buys with the Bennetts over the course of several months, all of which Malone captured in audio and video recordings. Inspectors also documented most communications between Malone and the Bennetts leading up to their meetings. Malone purchased heroin from Eric at the first five controlled buys, and from Marcus at the remaining six.

In addition to the controlled buys, law enforcement executed search warrants at the Victory Lane Bar & Grill ("the Victory Lane"), from which Marcus sold drugs; a home on Gilligan Street next to the Victory Lane, where Marcus's then-girlfriend, Juliyah Young, resided; and Marcus's home. The searches yielded 418.65 grams of heroin at the Gilligan Street house, but law enforcement did not find any drugs at the other locations. Following a vehicle chase by law enforcement, Eric was arrested on the same day as the searches. Law enforcement detained Eric

and searched his vehicle, where they found a loaded firearm in the glove box and retraced Eric's path to find two packages of heroin that he had thrown out of his vehicle's window. Marcus was arrested a few months later after he had sold drugs to Malone on two additional occasions.

A grand jury indicted Marcus and Eric for conspiracy to distribute heroin, conspiracy to murder a federal employee, attempted murder of a federal employee, and forcible assault of a federal employee. It indicted only Eric for discharge of a firearm during a violent crime, possession of a firearm by a convicted felon, and the use or possession of a firearm in furtherance of a drug-trafficking crime.

Malone died before trial began, so Marcus and Eric moved to exclude all recordings of the controlled buys that Malone had captured as inadmissible hearsay and violative of the Confrontation Clause. Following a hearing, the district court denied the motion.

Marcus and Eric proceeded to trial. The jury convicted Marcus and Eric of conspiring to distribute heroin, and it convicted Eric of being a felon in possession of a firearm and possessing a firearm in furtherance of a drug-trafficking crime. The district court sentenced Marcus to 168 months in prison and Eric to 200 months in prison. Defendants timely appealed.

II.

Marcus and Eric appeal their convictions, arguing that the district court erred by admitting at trial certain testimony given by Inspector Mehall. They assert that Mehall's testimony about Malone stating he could buy heroin from defendants violated their Confrontation Clause rights. Marcus separately challenges Mehall's testimony interpreting "plain English" statements made by Malone as contrary to Federal Rule of Evidence 701. We consider these arguments in turn.

A.

Marcus and Eric first raise the same Confrontation Clause challenge. Mehall twice testified that Malone stated to law enforcement that he believed he could purchase heroin from the Bennetts. This testimony, defendants argue, violated the Confrontation Clause because Mehall testified as to testimonial out-of-court statements that were offered for the truth of the matter and made by Malone, whom the Bennetts could not cross examine. Neither Marcus nor Eric contemporaneously objected to this testimony.

We review preserved Confrontation Clause arguments de novo, *United States v. Powers*, 500 F.3d 500, 505 (6th Cir. 2007), and unpreserved ones for plain error, *United States v. Collins*, 799 F.3d 554, 576 (6th Cir. 2015); *United States v. Hadley*, 431 F.3d 484, 498 (6th Cir. 2005). Because defendants failed to preserve this issue for appeal, we would normally review their Confrontation Clause argument for plain error.[1] However, the government must ask for plain error review, and it did not do so here. We therefore review defendants' Confrontation Clause argument de novo, *see, e.g.*, *United States v. Williams*, 641 F.3d 758, 763–64 (6th Cir. 2011), subjecting any violations to a harmless-error analysis, *United States v. McGee*, 529 F.3d 691, 697 (6th Cir. 2008).

---

[1]Below, defendants argued the admission of the recordings violated the Confrontation Clause. But their appeals focus on the issue of Malone's statements to law enforcement, which they did not raise below (let alone contemporaneously object to) and thus is unpreserved. *See United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009) (raising an issue for the first time on appeal); *United States v. Ford*, 761 F.3d 641, 653 (6th Cir. 2014) (contemporaneous objection requirement).

Further, although Eric contended at oral argument that his appellate brief marginally challenged the district court's admission of the recordings, it did not and instead raised an authentication issue with one of the recordings. This authentication argument, which Eric raised for the first time on appeal, also was not properly preserved and is arguably abandoned because he failed to fully develop it. *See, e.g.*, *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1063 (6th Cir. 2014). In any event, the admission of the recordings was proper under both the Sixth Amendment and the Federal Rules of Evidence. *See, e.g.*, *United States v. Harrison*, 54 F.4th 884, 887–88 (6th Cir. 2022).

Whatever lens we use to review this argument is immaterial because any error the district court may have committed in admitting Mehall's testimony regarding Malone's statements was harmless.

The Confrontation Clause guarantees every criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Consequently, defendants are permitted to cross-examine the government's witnesses at trial. *See Delaware v. Fensterer*, 474 U.S. 15, 18 (1985) (per curiam). "[W]hen a witness can't testify at trial and hasn't been cross-examined, the Confrontation Clause forbids entry of the witness's statements that are: (1) testimonial and (2) hearsay." *United States v. Harrison*, 54 F.4th 884, 887 (6th Cir. 2022).

Mehall's testimony about Malone's inculpatory statements is undoubtedly problematic. Malone's out-of-court statements were testimonial, *see Crawford v. Washington*, 541 U.S. 36, 51–52 (2004); *United States v. Cromer*, 389 F.3d 662, 670–71, 675 (6th Cir. 2004), and used for the truth of the matter asserted (to prove that he could buy heroin from the Bennetts), *see United States v. Deitz*, 577 F.3d 672, 683 (6th Cir. 2009). However, any purported Confrontation Clause violation does not warrant reversal because any such error was harmless. *See McGee*, 529 F.3d at 697. Defendants engaged in eleven controlled buys, all of which were captured on audio and video recordings; numerous witnesses testified about the Bennetts' criminal enterprise; the Bennetts' phone records revealed drug-trafficking activity; law enforcement recovered a distribution-level quantity of heroin at the Gilligan Street house; and the Lester shooting was a speculated consequence of the Bennetts' drug trafficking. *See id.*; *Powers*, 500 F.3d at 510. Defendants take issue with only two words (i.e., "Yes" and "Correct") of Inspector Mehall's dayslong testimony, which was a minuscule portion of the evidence provided over the course of the six-day trial.

The evidence at trial overwhelmingly implicated the Bennetts in a conspiracy to distribute heroin, so they are not entitled to relief despite the alleged error.

B.

Next, Marcus challenges additional portions of Inspector Mehall's testimony. He argues that when Mehall—who testified only as a lay witness—interpreted Malone's "plain English" text messages and phone calls, he violated Federal Rule of Evidence 701. Because Marcus failed to object at trial to the testimony he challenges on appeal, we review his evidentiary argument for plain error.[2] *See United States v. Young*, 847 F.3d 328, 349 (6th Cir. 2017). To establish plain error, Marcus must demonstrate that "(1) an error occurred; (2) the error was obvious or clear; (3) the error affected his substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Mayberry*, 540 F.3d 506, 512 (6th Cir. 2008) (citation omitted).

Rule 701 allows lay witnesses to give opinion testimony if the opinion is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. The party offering testimony under this rule bears the burden of establishing all three requirements. *United States v. Freeman*, 730 F.3d 590, 595–96 (6th Cir. 2013). "The function of lay opinion testimony is to describe something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a

---

[2]Marcus contends that we should review his evidentiary claim for abuse of discretion based on defendants' objection at trial to "anything" Malone said. But as explained above, defendants objected to the recordings, not Mehall's testimony. So we review this claim for plain error. *Cf. United States v. Poulsen*, 655 F.3d 492, 510 n.6 (6th Cir. 2011); *Ford*, 761 F.3d at 653.

particular event." *United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015) (internal quotation marks and brackets omitted).

In the context of a law enforcement officer testifying under Rule 701, his lay opinion is admissible only if the officer "is a participant in the conversation, has personal knowledge of the facts being related in the conversation, or observed the conversations as they occurred." *Id*. (citation omitted). Although officers may "interpret intercepted messages in which they neither participated nor observed first-hand," "[a]n officer's lay testimony goes too far when it includes vague statements about the investigation, repeatedly relies on the general knowledge of the entire department or agency, or otherwise fails to limit the testimony to personal experience." *United States v. Honeysucker*, 2023 WL 142265, at *6 (6th Cir. Jan. 10, 2023) (citing *Kilpatrick*, 798 F.3d at 379; *Freeman*, 730 F.3d at 596–97).

Marcus appeals the admission of much of Mehall's testimony under Rule 701(b), arguing that the testimony at issue was not necessary to help the jury because it interpreted "plain English" communications. For example, texts and phone calls between Malone and Marcus revealed statements such as "Can't get ahold of little bra. Trying to get right," "I done backed up for real," "I'm about to get back in the flow of things," "Just one. Just one. One whole," and "Need ya." Mehall interpreted such statements to mean that Malone arranged to buy heroin from Marcus.

On one hand, much of Mehall's testimony did not violate Rule 701 because several of Malone and Marcus's communications were cryptic (e.g., "I done backed up for real," "I went on and finessed me a little play, man. Got a little something popping, man," and "Just one. Just one. One whole"), and Mehall's interpretation of these statements certainly could have aided the jury. *See Kilpatrick*, 798 F.3d at 380 ("When it comes to interpreting language from intercepted communications, an agent can be helpful when she uses her personal knowledge of the case to

interpret cryptic language."); *see also Young*, 847 F.3d at 350 ("We hold that the district court did not plainly err in admitting Agent Whitsett's testimony because, as the district court noted during trial, '[t]here was enough slang and jargon used that [Agent Whitsett's] testimony as to what they were talking about was necessary and will be helpful to the jury.'" (brackets in original)). Such testimony was therefore properly admitted. *See Young*, 847 F.3d at 350–51 (finding no plain error in a law enforcement officer's testimony opining that "quarter" means a "quarter ounce of crack cocaine").

On the other, a jury likely could have interpreted some of these communications without Mehall's assistance. For example, phrases like "I'm gonna need you tomorrow, if that's cool," "I was handling it right now," and "I'm about to get back in the flow of things" are not slang or jargon that require translation. By "interpreting even ordinary English language," Mehall "spoon-fed his interpretations of the phone calls [and text messages] and the government's theory of the case to the jury." *Freeman*, 730 F.3d at 597. Thus, the admission of Mehall's commentary regarding these ordinary, plain communications violated Rule 701. *See Kilpatrick*, 798 F.3d at 381 ("[A] case agent testifying as a lay witness may not explain to a jury what inferences to draw from recorded conversations involving ordinary language because this crosses the line from evidence to argument." (internal quotation marks omitted)).

But once again, the district court's error does not require reversal given the overwhelming evidence of defendants' drug trafficking. Further, the communications at issue here all preceded controlled buys. A rational jury could consult the text messages and transcripts of phone calls and reasonably conclude on its own that "Need ya," for example, means that Malone was seeking to purchase heroin, especially given that he did, in fact, purchase heroin soon after these communications. Although some of Mehall's testimony violated Rule 701, the admission of this

testimony did not affect Marcus's substantial rights or the outcome of the trial, barring any relief. *See Honeysucker*, 2023 WL 142265, at *8.

III.

Defendants additionally appeal their sentences. Marcus challenges the district court's imposition of the Guidelines' drug-house enhancement, and Eric challenges the adequacy of the government's 21 U.S.C. § 851 notice and the district court's relevant-conduct findings concerning drug weight attributable to him.

A.

Marcus argues the district court erred in applying to his sentence the two-level drug-house enhancement under U.S.S.G. § 2D1.1(b)(12). The government bears the burden of establishing by a preponderance of the evidence that a sentencing enhancement applies. *United States v. Byrd*, 689 F.3d 636, 640 (6th Cir. 2012). "Whether a district court properly applied a sentencing enhancement is a matter of procedural reasonableness." *United States v. Taylor*, 85 F.4th 386, 388 (6th Cir. 2023). When evaluating procedural reasonableness, "we review the district court's interpretation of the Guidelines de novo, and its factual findings for clear error." *Id.* "Under clear-error review, we affirm a district court's finding of fact so long as the finding is plausible in light of the record viewed in its entirety." *United States v. Grant*, 15 F.4th 452, 457 (6th Cir. 2021) (internal quotation marks and brackets omitted). There exists an intra-circuit split, however, over the proper standard to apply when reviewing mixed questions of law and fact concerning sentencing enhancements. *See United States v. Bell*, 766 F.3d 634, 636 (6th Cir. 2014). Here, because the application of the drug-house enhancement was not erroneous under either standard, we need not resolve the split.

Section 2D1.1(b)(12) of the Sentencing Guidelines provides for a two-level enhancement for drug crimes if the defendant "maintained a premises for the purpose of manufacturing or distributing a controlled substance." *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013) ("[T]he drug-house enhancement applies to anyone who (1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled substance."). With respect to the "maintaining" element, the only element at issue here, we must consider "whether the defendant held a possessory interest in . . . the premises" and "the extent to which the defendant controlled access to, or activities at, the premises." U.S.S.G. § 2D1.1 cmt. n.17. "If a defendant does not have a legal interest in the premises, the enhancement may still apply if the government makes a sufficient showing of de facto control." *United States v. Hernandez*, 721 F. App'x 479, 484 (6th Cir. 2018). De facto control, however, requires "something more than the act of distribution from the premises." *Id.* Notably, "[m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained," but it must be "one of the defendant's primary or principal uses for the premises." U.S.S.G. § 2D1.1 cmt. n.17.

After the district court applied, over Marcus's objection, the two-level drug-house enhancement, it sentenced Marcus to 168 months' imprisonment—a term at the bottom of his Guidelines range. Marcus now appeals the district court's finding that he "maintained" the Gilligan Street house—where over 400 grams of heroin were found in the ceiling over the water heater. Marcus did not hold a legal or possessory interest in the Gilligan Street house; rather, Juliyah Young (Marcus's then-girlfriend) resided at the Gilligan Street house during the relevant time. As such, he presumably argues that he was merely a "casual visitor" at the house, which is insufficient for the drug-house enhancement to apply. *See Hernandez*, 721 F. App'x at 484.

At trial, Young testified that the heroin found at her home was not hers and that she did not know it was located there. Young never explicitly testified that the heroin found in the Gilligan Street home belonged to Marcus or that he "allowed" her to stay at the home, although the district court erroneously stated the contrary at sentencing.

Even though the district court misstated Young's trial testimony at sentencing, it did not err in imposing the drug-house enhancement because the record supported the application of the enhancement. *See id.* (explaining that other actions like "supervising," "protecting," and "[maintaining] continuity [at]" a location can constitute "maintenance" under § 2D1.1(b)(12) (first alteration in original) (quoting *United States v. Russell*, 595 F.3d 633, 644 (6th Cir. 2010))). The government proved by a preponderance of the evidence that the heroin found at the Gilligan Street house was Marcus's and that he stored it there prior to distribution on one of the many occasions he visited the home to sell drugs in the alley between the Victory Lane and the Gilligan Street house. Indeed, the day after law enforcement searched the home, Marcus called the cousin with whom he operated the Victory Lane and said, "They got her, but they missed me, dude. They missed me." Mehall testified that this statement meant that law enforcement found Marcus's heroin at the Gilligan Street (i.e., "her" or Young's) house, but they failed to find his heroin at the Victory Lane. Law enforcement also found additional indicia of drug trafficking at the house: a "powdery substance" packaged in little plastic baggies and a duffel bag with a press and mixer in it. The government sufficiently showed Marcus's de facto control of the Gilligan Street house for the purpose of storing heroin prior to distribution, and thus, the district court did not err in applying the drug-house enhancement.

B.

Eric also challenges his sentence. He first takes issue with the adequacy of the government's § 851 information and notice of his four prior felony drug convictions following a change in the law triggering an enhanced sentence under this statute. Although Eric originally argued in his appellate brief that we review this argument de novo, he conceded at oral argument that plain error review applies, given his failure to raise the issue before the district court. *See United States v. Brooks*, 628 F.3d 791, 796 (6th Cir. 2011).

To increase Eric's statutory mandatory-minimum sentence for his conspiracy conviction, the government filed an information and notice of his four prior felony drug convictions pursuant to §§ 851 and 841(b)(1)(B)(i). After the government filed the § 851 notice and before the Bennetts' trial, Congress passed the First Step Act of 2018, which, in part, amended the requirements to impose an enhanced sentence for this type of conviction. *See United States v. Fields*, 53 F.4th 1027, 1031 (6th Cir. 2022). Following the First Step Act's enactment, a defendant is eligible for an enhanced drug-conspiracy sentence if he has at least one prior conviction for a "serious drug felony," not a "felony drug offense," as previously required. *Id.*; 21 U.S.C. § 841(b)(1)(B)(i). Relevant here, a "serious drug felony" does not encompass mere possession offenses, unlike a "felony drug offense." *Compare* 21 U.S.C. § 802(57), *with* § 802(44). *See also* 18 U.S.C. § 924(e)(2)(A). After this definitional change, three of Eric's four prior offenses—which were merely possession offenses—no longer triggered an enhanced mandatory-minimum sentence for his conspiracy conviction. Yet, the government did not amend the § 851 notice to reflect the change in the law.

Eric argues that the government's failure to amend the § 851 notice means it failed to meet its burden to prove that he was previously convicted of a "serious drug felony," so the district court

improperly increased his mandatory-minimum sentence from five to ten years. *See* 21 U.S.C. § 841(b)(1)(B)(i). Notwithstanding, Eric's Guidelines range was 140–175 months on the conspiracy-to-traffic-heroin and felon-in-possession convictions, plus a mandatory 60-month consecutive sentence for his conviction for possessing a firearm in furtherance of drug trafficking. The district court ultimately sentenced Eric to 200 months' total imprisonment (140 months on the conspiracy and felon-in-possession offenses and 60 months on the remaining offense), which was at the bottom of the Guidelines range.

There was no error in calculating Eric's mandatory-minimum sentence. Despite the government's failure to amend the § 851 notice, Eric still had one previous conviction that constituted a serious drug felony: trafficking cocaine in Jefferson County, Kentucky. At sentencing, the government explained why Eric's mandatory-minimum sentence under §§ 841(b)(1)(B)(i) and 851 was ten years due to his prior drug-trafficking conviction. Thus, the district court did not err in calculating Eric's mandatory-minimum sentence for his conspiracy conviction.[3]

In any event, even if the district court erred, such error did not affect Eric's substantial rights because the district court imposed a sentence greater than a five- or ten-year mandatory

---

[3]Eric argues that the district court further erred under § 851(b), which gives defendants the opportunity to "affirm[] or den[y]" that they have previously been convicted of the offenses alleged in a § 851 notice. 21 U.S.C. § 851(b). He complains that the district court never gave him the opportunity to dispute his alleged prior offenses, especially given the purported deficiencies in the government's notice. But the district court did not err because Eric was precluded from challenging the validity of his prior serious drug felony, which "occurred more than five years before the date of the information alleging such prior conviction." 21 U.S.C. § 851(e). Moreover, even if the district court erred, any such error was harmless. *See United States v. Hill*, 142 F.3d 305, 313 (6th Cir. 1998) (holding that the district court's failure to engage in a § 851(b) colloquy was harmless because the defendant never filed a § 851(c)(1) response challenging his prior convictions: "there is no reason for a district court to conduct a hearing on the validity of the prior convictions when a defendant fails to first meet the requirements of 21 U.S.C. [§] 851(c), which requires that a defendant give advance notice concerning the basis of his challenge").

minimum on the conspiracy conviction. Nothing in the record indicates that the district court felt constrained by the ten-year mandatory minimum or that it would have imposed a lesser sentence had it found the five-year mandatory minimum appropriate. *See United States v. Haque*, 315 F. App'x 510, 529 (6th Cir. 2009) (noting that the district court "did not feel bound by any statutory minima," so any error was harmless).

C.

Eric raises one final challenge to his sentence: that it is procedurally unreasonable because the district court attributed certain drug weight to him that was not relevant conduct. We review the district court's factual determination regarding the quantity of drugs involved in an offense for clear error.[4] *United States v. McReynolds*, 964 F.3d 555, 563 (6th Cir. 2020). "A factual finding is clearly erroneous where, although there is evidence to support that finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Russell*, 595 F.3d at 646 (internal quotation marks omitted).

Both Eric and Marcus were found guilty of conspiracy to possess with intent to distribute between 100 and 1000 grams of heroin. Eric's base offense level was calculated based on a total of 742.52 grams of heroin, which accounts for the heroin recovered from the Gilligan Street house search; from Eric's arrest, where he discarded the two packages of heroin out of his car's window; and from all eleven controlled buys—only five of which Eric directly participated in. Over Eric's objection that he should be held responsible for only the amount of heroin he directly sold to Malone, the district court found all 742.52 grams to be relevant conduct based on defendants' conspiracy. On appeal, Eric argues that the drugs recovered from the Gilligan Street house and

---

[4]Framing his argument as one challenging procedural reasonableness, both Eric and the government contend that our review is for abuse of discretion. But because his argument is more appropriately framed as a factual challenge to relevant conduct, our review is for clear error.

the amount of drugs Marcus directly sold—especially during buys that occurred after Eric was arrested and incarcerated—should not have been considered relevant conduct under U.S.S.G. § 1B1.3. Thus, Eric contends his sentence is procedurally unreasonable.

"For defendants convicted of drug crimes, the base offense level at sentencing depends upon the amount of drugs involved in the offense." *McReynolds*, 964 F.3d at 562 (citation omitted). A defendant's base offense level is derived from his "relevant conduct," as defined under U.S.S.G. § 1B1.3. *Id.* "Relevant conduct" includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," as well as actions jointly undertaken by co-conspirators if such actions were "[(1)] within the scope of the jointly undertaken criminal activity, [(2)] in furtherance of that criminal activity, and [(3)] reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1). Relevant conduct need not be charged, *United States v. Gill*, 348 F.3d 147, 151 (6th Cir. 2003), and it can even include acquitted conduct, *United States v. White*, 551 F.3d 381, 385 (6th Cir. 2008) (en banc).

For conspiracies, "the scope of relevant conduct with regard to the drug amounts involved in a conspiracy under § 1B1.3(a)(1)(B) is 'significantly narrower' than the conduct needed to obtain a conspiracy conviction." *McReynolds*, 964 F.3d at 563 (citation omitted). But "in order to hold a defendant accountable for the acts of others [under § 1B1.3(a)(1)(B)], a district court must make two particularized findings: (1) that the acts were within the scope of the defendant's agreement; and (2) that they were foreseeable to the defendant." *Id.* (brackets in original). At

sentencing, the government must prove by a preponderance of the evidence that a certain drug quantity is attributable to the defendant as relevant conduct. *Id.*; *Gill*, 348 F.3d at 151.

Eric argues that his relevant conduct includes only the drugs that he directly sold to Malone plus the drugs recovered during his arrest:  267.84 grams of heroin.  This argument erroneously narrows the scope of U.S.S.G. § 1B1.3(a)(1).  True, Eric directly sold heroin to Malone during only five of the eleven controlled buys, but Eric was still a member of the conspiracy, and Marcus's sales were reasonably foreseeable in connection with their heroin-trafficking scheme.  Law enforcement obtained tracker and tracer warrants for both defendants' phones, and communications from their phones, as well as surveillance of defendants, revealed evidence of joint heroin trafficking.  And during the beginning of Malone's time as a CI, Marcus referred Malone to Eric to buy heroin.  Although Marcus continued to sell heroin to Malone after Eric's arrest, the record does not show that Eric ever withdrew from the conspiracy.  With respect to the heroin found at the Gilligan Street house, on the day that Eric was arrested, Marcus and Eric had a cryptic phone conversation while Marcus was at the Gilligan Street house immediately before Marcus and Eric met at Marcus's house.  At that meeting, Eric presumably obtained from Marcus the packages of heroin that Eric discarded during his arrest later that day.  Based on the evidence at trial, the government proved by a preponderance of the evidence that the heroin recovered from the Gilligan Street house and from Marcus's sales should be included in Eric's relevant conduct.

To be certain, the district court made particularized findings at sentencing that all 742.52 grams of heroin were attributable to Eric.  The district court consulted two examples in the application notes of § 1B1.3 where a defendant's relevant conduct was limited, despite being in a conspiracy, and the court explained why Eric's case was distinguishable from those examples.  *See* U.S.S.G. § 1B1.3 cmt. n.4(C)(v), (vii).  Unlike in the application-note examples, the district court

here opined that "there's no evidence that Eric only agreed to distribute a certain number of grams or only complete one delivery" or that Eric ever withdrew from the conspiracy. The district court was not clearly wrong in its relevant conduct determination, especially considering that Eric was found guilty beyond a reasonable doubt of conspiring to distribute between 100 and 1000 grams of heroin. Our precedent allows sentencing courts to consider acquitted conduct as relevant conduct, so it certainly was not clear error for the district court to consider as Eric's relevant conduct a total drug quantity that he had been convicted of conspiring to distribute. *See White*, 551 F.3d at 385.

## IV.

We affirm the judgment of the district court.

CHAD A. READLER, Circuit Judge, concurring. I join today's opinion in full. I write separately to draw attention to a line of precedent that deserves revisiting.

As the Court correctly notes, in criminal cases, we ordinarily review unpreserved errors using the plain-error test. *See, e.g.*, *United States v. Powers*, 500 F.3d 500, 505 (6th Cir. 2007). That is so for many reasons. Start with the fact that doing so is mandated by Federal Rule of Criminal Procedure 52(b). But there are other justifications. For example, this practice encourages defendants to raise issues in a timely manner, which allows for their fulsome development at trial and prevents delays caused by multiple appeals and remands. It also honors the district court's threshold role in resolving disputed issues. *See also United States v. del Carpio Frescas*, 932 F.3d 324, 333–44 (5th Cir. 2019) (Oldham, J., concurring) (outlining the history and purposes of plain-error review). As the plain-error standard recognizes, it would be unfair to hold a district court to the same standard when an issue "was not brought to the court's attention." Fed. R. Crim. P. 52(b).

Yet despite these many commendable goals, we deviate from our customary standard of review when the government fails to ask for this more forgiving standard. *United States v. Williams*, 641 F.3d 758, 763–64 (6th Cir. 2011). It is difficult to understand why. Over a decade ago, then-District Judge Thapar questioned this practice. *See id.* at 770–73 (Thapar, J., concurring). Still today, I find his reasoning persuasive. As he explained, our approach conflicts with the plain text of Federal Rule of Criminal Procedure 52(b)—reason enough to raise deep suspicions. *Id.* at 771. But Judge Thapar went further. Drawing on his experience in the district court, he noted that our modified approach leads us to evaluate the district court's judgment as if it had considered and ruled on an issue—when in fact it has not, due to no fault of its own. *Id.* at 770–71. That is hardly fair to our colleagues on the trial court. In the end, the lone party to benefit is the defendant, who receives a more generous standard of review, despite his own inattention.

True, the government sometimes is similarly inattentive, as in this instance, by failing to raise with us Bennett's omission in the district court. But that should not deprive the appeals court of affording the district court the deference it is owed. How to evaluate the district court proceedings is a decision more appropriately within the province of the court than the parties. *See K & T Enterprises, Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir. 1996) ("The parties, however, cannot determine this court's standard of review by agreement. Such a determination remains for this court to make for itself."); *United States v. Bain*, 586 F.3d 634, 639 n.4 (8th Cir. 2009) ("A party's concession on the standard of review does not bind the court."). We would not, for instance, review a grant of summary judgment for an abuse of discretion merely because the parties, for whatever reason, asked for it. *See United States v. Murguia-Rodriguez*, 815 F.3d 566, 579 (9th Cir. 2016) (Callahan, J., dissenting). The government, in other words, may not tinker with the standard of review, intentionally or unwittingly, by failing to highlight a defendant's forfeiture. That does not mean the government's hands are tied should it believe a miscarriage of justice occurred in the district court. In that case, the government may concede error, thereby putting a thumb on the scale for us as we consider the issue.

These concerns notwithstanding, this practice remains the law in our Circuit, one we are bound to follow. As the circuits are not all of one mind on the matter, further review, either by our en banc court or the Supreme Court, would be welcomed.